## CHASE RAND CORPORATION v. CENTRAL INS. CO. OF BALTIMORE.

District Court, S. D. New York.

April 9, 1945.

Rothstein & Korzenik, of New York City (Martin M. Kolbrener, of New York City, of counsel), for plaintiff.

Kaufman & Cronan, of New York City (Jesse Climenko, of New York City, of counsel), for defendant.

KNOX, District Judge.

Plaintiff here seeks to recover $3204.33 from defendant for an alleged loss by robbery of a quantity of jewelry which, under specified conditions, was protected by the provisions of a "Jeweler's Block Insurance Policy," issued by defendant. Except as particularly set forth in the policy, plaintiff was protected from loss or damage to its property arising from any cause whatever.

Plaintiff, pursuant to a memorandum agreement, shipped certain jewelry to Ben Levit, who was engaged in that line of business in San Antonio, Texas. This agreement was to the effect that title to the goods delivered to Levit should not pass to the latter "until any selection (of particular items) is approved in writing by Chase Rand Corporation, and a bill of

---

sale rendered." Levit, meanwhile, assumed full responsibility to plaintiff for loss or damage of the goods, whether with or without negligence upon the part of himself, or his agents, his liability to be measured upon the assumption that he was an insurer, and not a bailee.

On or about July 24, 1942, Ben Levit entrusted certain items of jewelry received from plaintiff to his nephew, Hyman Levit, who, as a salesman for the former, traveled by automobile through certain portions of Texas, seeking customers for the goods. At about 4:30 o'clock that afternoon, John W. Hudspeth, who is engaged in mining in New Mexico, and who is also a peace officer of that state, started by automobile from a point 25 miles south of Deming, New Mexico, to San Antonio, Texas. After crossing the western boundary of the latter state, he picked up two young men who wished to ride in the direction he was traveling. After passing through El Paso, Hudspeth proceeded along a highway known as Route 80, towards his destination. At about 11:30 p.m. he had reached a point about seven or eight miles west of Van Horn, Texas, and 127 miles east of El Paso. His attention was there attracted by an unidentified man who was waving a flashlight back and forth across the road. Stopping his car, Hudspeth alighted, observed two automobiles at one side of the road, and began talking to the man who had signaled him to stop. Standing nearby was Hyman Levit. Upon inquiring the occasion for the signals, Hudspeth was told that "This man (Levit) says he has been held up or highjacked," and Levit added, "We need an officer out here." Hudspeth suggested that the man with the flashlight should immediately proceed to Van Horn and summon the county sheriff or a highway patrolman to the scene. The unidentified man, and who had preceded Hudspeth along Route 80, and who had come across Levit in apparent distress, got in his car and started towards Van Horn. Hudspeth then turned to Levit, and asked what had happened. The latter said that he was on his way east from El Paso, and at 4:30 p.m., having reached the point where he was found, his car had developed tire trouble. Thereupon, he had stopped and alighted from the car to examine and fix the tire. This engaged his attention for about 30 minutes and while so engaged, and being in a stooping position, two men came towards him—

one of whom struck him on the head with a metal tire tool. In answer to a question as to where he had been hit, Levit indicated his forehead where Hudspeth saw some slight scratches, but no blood. The night was clear and a moon shone. In addition Hudspeth had a flashlight. With its aid he discovered a pair of eye glasses lying on the ground, the lenses of which were broken. At this discovery, Levit said the glasses belonged to him and added, "They knocked my glasses off." His hat, also, was in a crushed condition. He went on to declare that the blow he had received had knocked him unconscious for about 15 minutes, and that on recovering his senses, he found he had been robbed of diamonds having a value of $30,000, his wallet containing $55 in cash, and his automobile ignition key. Levit further said that he believed the men who had assaulted him were Mexicans, and that, following the robbery, they drove away at a high rate of speed towards Van Horn. He believed, however, that they soon turned about and had driven towards El Paso, from which place he thought they had followed him. Hudspeth took his flashlight and walked along the road for several hundred feet to see if he could find tire marks which would indicate that a car had turned about on the road. Finding none, and after a lapse of 25 minutes, he returned to Levit and found that the boys who were traveling with him (Hudspeth) had put a spare tire on the left front wheel of Levit's car. Meanwhile, no one had arrived from Van Horn, and Hudspeth asked Levit if he wished to be towed to that town. Receiving an affirmative reply, Hudspeth, together with his companions, attached tow chains to Levit's car. Thereupon, one of the boys, together with Levit, got into the latter's car and Hudspeth and the other boy then towed the car to Van Horn. On reaching a point two miles west of Van Horn, they met A. A. Anderson, Sheriff of Culberson County, Texas, and a highway patrolman, on their way to the location of the alleged robbery. After the officers had talked with Levit, out of the hearing of Hudspeth and the boys, the entire party proceeded to an automobile service station in Van Horn. Hudspeth, who was in a hurry to get away, occupied himself in servicing his car in order to continue his journey. Levit then thanked him for his assistance, and bought soft drinks for some members of the group. He paid for

his purchases with a one dollar bill, which he took from a wallet or bill fold. Hudspeth then entered his car, and drove away.

The only other testimony that touches this phase of the case consists of answers to direct and cross interrogatories that were propounded to Sheriff Anderson and to R. S. Dixon, an employee of the gas filling station to which Levit's car was towed.

The Sheriff's statement as to what Levit told him is this: "He (Levit) said that at a point about the town of Allamore, about two miles from where he stopped, he felt the car pulling to one side, and he got out and looked at it, and thought he could make it on to Van Horn, but when he got about two miles he felt it bump and got out again and looked at it, and a tire was flat. He said that just after he stopped, a car came up, a black sedan, with two men in it who asked him if he was having trouble, and he told them he had a flat tire. They offered to help him. They got out of their car and came around to him. He opened the door of his car and set a bag out on the ground—the one he carried his diamonds in. He reached back in the car to remove something that was in his way of getting his spare tire, and something struck him on the head. When he came to, he was down on his knees with his hands resting on the running board. He got up and looked around and the car and men were gone. Also, his bill fold with $55. in it and his car keys were gone. The Sheriff added that as Levit gave him this account of what had happened to him "he seemed nervous, and would shake at times, then he would stop shaking for a time." Hudspeth also testified that Levit acted nervously. Hudspeth and the Sheriff are also in accord with respect to the signs of physical injury that could be observed on Levit's body. The former said there were some little scratches on his head, but none of them was bleeding. The Sheriff's statement was, "There was a red place with a few scratches on his forehead." Between these two witnesses, however, there are one or two minor discrepancies. One of them has to do with the manner in which Levit's car was towed. Hudspeth says that, after a spare tire had been placed on the car, it was towed on all four wheels. The Sheriff declares that the front of the car was hoisted, and rode (it would appear) upon the two rear wheels. In my judgment, the testimony of Hudspeth is probably correct.

It was he who did the towing, and can best remember how it was done. Furthermore, it is unlikely that his truck was equipped with facilities whereby the front of Levit's car could be lifted from the ground. The passage of time, no doubt, has dulled the Sheriff's recollection to how the car was towed, and his statement in connection therewith is hardly more than an assumption. In any event, the discrepancy between the two witnesses is of little consequence. Another difference between the testimony of these witnesses is that the Sheriff, in answering the interrogatories propounded to him, made no reference to the purchase by Levit of soft drinks at the filling station, and his payment therefor. His failure so to do may possibly be due to the fact that no inquiry was made of him in respect to this subject matter.

In respect to Levit's other actions, and in regard to his statements, both Anderson and Hudspeth are in substantial agreement.

■ Dixon, the remaining witness, testified that he examined the inner tube of the tire of Levit's car that is said to have gone flat, and failed to find that it was punctured, or had any other defect. In carrying out his test, he filled the tube with air, and raised its pressure to 32 pounds. He then put the tube in a water vat, where it was left overnight. The next morning the air pressure within the tube was practically the same as it was the night before. While it may be that the valve on the tube leaked air when it was subjected to strain on the road, and thus brought about deflation of the tire, I am far from satisfied that this occurred, or that Levit was robbed. So far as this case is concerned, and aside from hearsay evidence, there is no proof as to what, if any, untoward event overtook him. At the time of trial, I took note of the fact that testimony from him as to what had happened was entirely lacking. Thereupon, I was informed that, by some procedure, he had been questioned in Chicago, whether by way of examination before trial, or by formal deposition at the instance of one of the parties, I do not recall. But, be this as it may, neither litigant saw fit to bring to my attention the statements or explanations that then were made. The result is that, upon the proof at hand, it is impossible to find that Levit, as is averred, was assaulted and robbed. Furthermore, while I am strongly suspicious of the truth of his statements, I am equally

unable to conclude that he made away with plaintiff's property.

Nevertheless, there is no doubt that plaintiff suffered the loss for which claim is made against defendant. Accordingly, the question remains as to whether, under the terms of its insurance policy, there ·can be a recovery.

Defendant, in its answer, and in addition to a general denial of the allegations of the ·complaint, sets forth six affirmative defenses. However, at the conclusion of the trial, all but two of these were abandoned. The ones that remain are these—

(2) That the defendant, by an exception ·contained in the policy, is without liability, if loss, damage or expense occurs to the assured as a result of theft or an act of ·dishonest character on the part of the as-·sured or his employee, or any person to whom the insured property may be de-'livered or entrusted. It is then alleged that the jewelry in question was entrust-·ed to Ben Levit on memorandum, and that he, in violation of his trust, delivered the same to Hyman Levit and that the loss was due to a breach of trust.

(6) That the loss, if it occurred at all, was the result of the conversion of plaintiff's merchandise by Hyman Levit, to whom Ben Levit had entrusted it, and that such conversion is not within the terms of the policy.

■ Neither of these defenses, in my judgment, has been established, and if either of them is to be available to defend-ant, it is defendant's burden to sustain the same. As has been previously said, the condition of this record is insufficient to enable me to find that the loss was due to any malfeasance on the part of Hyman Levit. My suspicions of his good faith are based, more or less, upon drawing one inference from another, and this process of reasoning cannot be utilized for the purpose of making a judicial determination. In addition, I do not believe that plaintiff is required, as defendant contends, to bear the burden of proving the loss was due to the robbery of Hyman Levit. The facts here, it seems to me, are within the rule of law set forth in Agricultural Insurance Co. v. A. Rothblum, Inc., 147 Misc. 865, 265 N.Y.S. 7, and I shall here follow Judge Collins' pronouncement in that case. Plaintiff's sole obligation was to furnish defendant with such explanation, as it, in good faith, received and accepted concern-

ing the time and cause of the loss, and this it has done. If plaintiff were required to go further, and, as it were, guarantee the accuracy of the explanation of a loss that might be given to it, by the person into whose custody goods had rightfully been given, and who, in reality, might himself be guilty of a fraud that was unknown to plaintiff, the inclusive character of the coverage of the insurance policy would be a delusion, and a snare. If it should actually be that the custodian of the chattels converted the same, and was thus guilty of a breach of trust, the defendant should establish the fact.