JEWELERS MUTUAL INSURANCE COMPANY, Appellant,

v.

Julien BALOGH and Harriet Balogh, d/b/a Balogh's of Coral Gables, Appellees.

No. 17763.

United States Court of Appeals Fifth Circuit.

Dec. 14, 1959.

Geo. J. Baya, Miami, Fla., for appellant.

Geo. H. Salley, Miami, Fla., for appellees.

Before RIVES, Chief Judge, and TUTTLE and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Involved again are questions under the standardized jewelers block policy.[1] There are two principal questions. First, whether the loss was within the all risks coverage or was eliminated by the exclusion of mysterious disappearance or unexplained loss. Second, whether a similar block policy or a personal property floater issued to a bailor of some of the lost jewelry was "other insurance" to make the policy sued upon excess, not primary, insurance.

While we feel that after a pretrial order consolidating all of the cases for pretrial and trial, the record here became more complicated, longer, and hence more expensive than was really necessary, the case, as it was understood by the District

1. See Meyerson v. Jewelers Mut. Ins., 5 Cir., 1958, 255 F.2d 366.

Judge and as it comes to us, is simple in outline. In its real simplicity it was not the multi-party, multi-cause, five-cornered Donnybrook which the externals presented and to the exaggeration of which some of the trial strategy seemed devoted.

Julien[2] owned the jewelry store in Coral Gables where the jewels were lost. Julien had a block policy with Jewelers Mutual which covered him as named assured. The jewelry lost was in three main categories: (1) that belonging to Julien, (2) that on consignment from other dealers for display and ultimate sale, and (3) that on consignment for such purposes from his brother, David, of Miami. As to consignments (2) there was no proof of other insurance. As to consignments (3) the brother, David, had two policies: first, a jewelers block policy issued by Western Assurance; and second, a personal property floater issued by Pennsylvania covering one valuable diamond ring.

Julien sued Jewelers Mutual and recovered for (1), (2) and (3). The District Court rejected the defense of mysterious, unexplained loss applicable to all three. He also rejected the defense limited to (3) that David's policies from Western Assurance and Pennsylvania made the Jewelers Mutual policy excess. Although it has washed out by acquiescence and non-appeal, the Court also held Western Assurance and Pennsylvania liable to David but granted recovery to each of these insurers against Julien for negligence as bailee in the care of David's consigned property.

The details do not now concern us. The proof was quite adequate to show the existence of all of the jewelry in categories (1), (2), and (3) and Julien's custody of it in his store on Saturday noon, June 23. It was not missed until the midafternoon of the following Monday, June 25. The Court could, and did, find that the jewelry was kept in the ring box which was normally placed within in a locked compartment in the large safe, so that it was a safe-within-a-safe, but that beginning a few days before Saturday, as a matter of business convenience, the ring box had been placed on a shelf in the main safe. In this position it was not protected by a lock as the large doors to the main safe were merely closed and the combination knob turned a few digits.

Because no one actually saw the jewelry taken and there were no telltale marks of forcible appropriation, Jewelers Mutual denied liability on the sole and express ground that the loss was not covered because it was within the exclusion which reads:

"5(m) Unexplained loss, mysterious disappearance or loss or shortage disclosed on taking inventory. * * *."

The District Court held that since a loss was positively established, the nature of this policy cast the burden on the insurer, not the assured, to bring it within the exception, and this Jewelers Mutual had failed to do. We agree.

Julien was not content merely to establish custody and loss. The evidence offered went further and injected a touch of video romance which suggested at least a likely specific event to account for the missing jewelry. On Saturday afternoon, June 23, a man wearing a wool suit and a sweater—clothing hardly indigenous to this resort area for that season—"remained in the store browsing

---

2. These shorthand descriptives cover the following:

Julien Balogh and wife, Harriet, are the assureds under the block policy issued by Jewelers Mutual Insurance Company. Julien's suit against Jewelers Mutual was C.A. 7289.

David Balogh of Miami, Florida, is the named assured in the jewelers block policy of Western Assurance Company and the personal property floater of Pennsylvania Lumbermen's Mutual Insurance Company covering scheduled property including one of the lost diamond rings.

David's two suits against Western Assurance and Pennsylvania were numbered 7297, 7299; each insurer-defendant impleaded Julien as third party defendant for negligence as a bailee.

for about 20–30 minutes, and on at least one occasion was observed looking at merchandise on shelves in the vicinity of the safe." On Tuesday, the day following discovery of the loss and its immediate report to the local police, these witnesses examined the "mug shots" of known jewel thieves and identified that of one of them described by the insurer's loss investigator as a picture of Harry Sitamore, an internationally known jewel thief. Subsequently one of these witnesses was asked to (and did) identify this same person while he was in the hallway of the local state courthouse.

■ While apparently crediting most of this testimony, the court did not go the next step and find that Harry (the sweater man) stole the jewels. He reasoned that the assured was not required affirmatively to establish this, and if there were deficiencies in the proof of mysterious, unexplained disappearance, the insurer bore the consequences of non-persuasion. Considering this policy and its manifest purpose, we regard this approach as correct. It was, as its plain words of broad scope championed, comprehensive insurance against *all risks:*

"5. This policy insures against all risks of loss or damage to the above-described property arising from any cause whatsoever except:."

Then followed exceptions which exhausted the first thirteen letters of the alphabet with some having further numbered or lettered subdivisions covering a wide range of occurrences from atomic fission to theft from unscheduled display windows.

If the insurer's contention is sound, then as a condition precedent to liability, the assured would have to establish by a preponderance the negative of each of these manifold exceptions. Were he required to exhaust the gamut of these provisions what had been purchased and sold as all risks insurance would turn out to be something else. Instead of the policy affording coverage against all causes of damage except those specifically excluded, it would amount only to a named perils cover since the assured to negative the exception would have to establish for this case an actual theft or some other such event not specifically excluded.

■ There was a loss, and it was established by positive evidence. The assured did not have to go further to demonstrate that such loss was *not* caused by one of the excepted conditions. To escape the broad undertaking of this comprehensive cover, the insurer had the burden of establishing that. Chase Rand Corp. v. Central Ins. Co., D.C. S.D.N.Y.1945, 63 F.Supp. 626, affirmed, 2 Cir., 152 F.2d 963; Agricultural Ins. Co. v. A. Rothblum, Inc., 1933, 147 Misc. 865, 265 N.Y.S. 7; 29 Am.Jur., Insurance § 1444 (1940). The Court held that the insurer failed, and in its attack on this fact-legal finding, the insurer has not pierced the buckler and shield of F.R.Civ.P. 52(a), 28 U.S.C.A. Lumbermens Mutual Cas. Co. v. Klotz, 5 Cir., 1958, 251 F.2d 499, 501; Beit v. United States, 5 Cir., 1958, 260 F.2d 386; Campbell v. Barksy, 5 Cir., 1959, 265 F.2d 463.

This takes care of the losses in categories (1) and (2). Before examining the "other insurance" clause which Jewelers Mutual asserts requires that Julien, its assured, look elsewhere for his protection as to (3), it is fruitful to consider the exposures of a jeweler and the extent to which the insurance contract purports to match them with coverage. For while we are neither underwriters nor contract draftsmen, Maryland Cas. Co. v. Southern Farm Bureau Cas. Ins. Co., 5 Cir., 1956, 235 F.2d 679, 683, insurance as a subject of sale and service finds its business acceptability, indeed its economic existence, in the response made to the business demands and necessities of the business world. Indeed, the insurer here has undertaken to do as much. As a mutual company made up of jewelers, its policy recites in its opening lines that "[t]he Assured is hereby notified that by virtue of this policy he is a member of the Jewelers Mutual Insurance Company, and is entitled to vote * * * at any and all meetings of said

company." And its letterhead with all propriety proclaims modestly that it is "Directed and Managed by Jewelers—For Jewelers."

Of course jewelers know the risks of jewelers and both the likelihood and magnitude (in dollars) of loss of this type of merchandise of unusual value. For loss of property there are three principal exposures: (A) the jeweler's own stock in trade owned by him; (B) articles in the jeweler's custody belonging to customers who are not dealers, e. g., for repair, remounting, appraisal, etc.; and (C) articles in his custody belonging to others who are dealers or engaged in the jewelry trade, e. g., on consignment, etc. To cover (A) only leaves the jeweler with wide exposures which jeopardizes not only his pocketbook but his good will as a loss forces him into legal controversy with his clientele or a source of inventory supply. The minimum required is protection against *legal* liability to those in (B) and (C)—an objective which can be achieved either by making the insurance available to them as third party beneficiaries or by casting it in form of legal liability.

The standardized Jewelers Block Policy categorically provides, as does the one in suit, coverage for exposures (A), (B) and (C).[3] The property of the jewelers and his customers is treated alike and the insurance for (A) and (B) is extended as an indemnity. For apparent business reasons property of other dealers (C) is treated differently. It is not insured as such "but only to the extent of the Assured's * * * legal liability for loss of or damage thereto."

And in this case the theory of Julien's suit, adopted by the District Court, was that for property consigned to him by his brother David (described as category (3), supra), the Jewelers Mutual was liable because Julien had a legal liability as bailee. While much is still said by Jewelers Mutual about the nature of this bailment and the legal incidents either contractual or implied by law, we find it unnecessary to analyze this in any detail. The Court on ample evidence not successfully attacked, F.R. Civ.P. 52(a), found that Julien was negligent. Under a bailment for mutual benefit, which this most assuredly was, that was sufficient under Florida law to cast the bailee. 4 Fla.Jur. § 9. If Julien was legally liable, the policy applied and on such a finding *vis-a-vis* Jewelers Mutual it mattered not whether the dealer-bailor had or had not recovered judgment.[4]

3. The policy of Jewelers Mutual provided under 2(A) a total of $55,000 insurance "in respect of property at the Assured's premises" and then defined the "property insured" as follows:

"3. The property insured is as follows:

"(A) Pearls, precious and semi-precious stones, jewels, jewelry, watches and watch movements, gold, silver, platinum, other precious metals, and alloys and other stock usual to the conduct of the Assured's business, owned by the Assured;

"(B) Property as above described, delivered or entrusted to the Assured by others who are not dealers in such property or otherwise engaged in the jewelry trade;

"(C) Property as above described, delivered or entrusted to the Assured by others who are dealers in such property or otherwise engaged in the jewelry trade, but only to the extent of the Assured's own actual interest therein because of money actually advanced thereon, or legal liability for loss of or damage thereto."

4. This makes it unnecessary to base judgment or affirmance on the result in David's suits against his insurers. But we are unable to regard seriously the contention that since Jewelers Mutual had not been impleaded as a fourth party defendant in David's suits against Western Assurance and Pennsylvania (see note 2, supra) or vouched in by notice to defend, the findings of the District Court as to Julien's liability to David (or his insurers) were not binding on Jewelers Mutual. Under paragraph 10 of the policy, the Insurer had the right to take over the defense and adjust the loss and "the right at its option without expense to the Assured, to conduct and control the defense of and in the name of the Assured." Unlike the usual liability policies specifically prescribing for express notice by the assured of the commencement of legal proceedings against him, see, e. g.,

■ Since coverage for David's consignment was under coverage (C) and rested wholly on Julien's legal liability, the very terms of the "other insurance" clause found in the parenthetical phrase which we italicize for emphasis make it inoperative:

"11. It is understood and agreed that any insurance granted herein shall not cover (*excepting as to the legal liability of the Assured*), when there is any other insurance which would attach if this policy had not been issued, whether such insurance be in the name of the Assured or of any third party. It is, however, understood and agreed, that if under the terms of such other insurance (in the absence of this policy) the liability would be for a less amount than would have been recoverable under this policy (in the absence of such other policy) then this policy attaches on the difference."

The District Court, construing it in the light of exclusions in the policies of Western Assurance and Pennsylvania, held that this clause referred only to other insurance procured by Julien whether in his name or that of a third party. Julien makes the same contention. See Automobile Ins. Co. of Hartford, Conn. v. Springfield Dyeing Co., 3 Cir., 1940, 109 F.2d 533, 536. Julien urges additionally that, regardless of the actual origin of the "other" insurance, the identity of the person procuring or paying

for it, or the specification of the named assured, it does not, as clause 11 requires, "attach" unless such other insurance is for the benefit of Julien and can be taken advantage of by him. That, of course, is the way omnibus, drive-other-car, etc. clauses work in the familiar automobile liability policies. United Services Automobile Ass'n v. Russom, 5 Cir., 1957, 241 F.2d 296; General Ins. Co. of America v. Western Fire & Cas. Co., 5 Cir., 1957, 241 F.2d 289; Continental Cas. Co. v. Suttenfield, 5 Cir., 1956, 236 F.2d 433.

But we need not assay these contentions. The language of Clause 11 is plain. It removes altogether from the operation of the "other insurance" clause situations in which coverage is claimed by reason of "the legal liability of the Assured." And this makes good sense. Especially does it in the atmosphere of the practical business world—here not only that of jewelers, but now of underwriters as well. For subrogation, as an equitable or contractual right, is an important incident of property insurance. A jeweler having consignment goods in his custody for which he has a potential legal liability for safe return is hardly protected if property indemnity insurance held by his bailor-consignors cuts off resort to his own liability insurance. For the moment the property insurers pay the loss to their assured (the bailor), subrogation gives them a right of action against the bailee who thus stands naked and uninsured. That does not meet the

Navigazione Alta Italia v. Columbia Cas. Co., 5 Cir., 1958, 256 F.2d 26, the Jewelers Block policy has only a general provision for notice. "13. In the event of loss or damage, or of anything likely to result in a claim under this policy, the Assured shall give immediate notice in writing to the Company * * *." Formal written notice was not given of the filing of the third party complaints against Julien. But in a record showing express consolidation of all three cases for pretrial and trial and Jewelers Mutual's advocate being the principal interlocutor in these 655 pages, Jewelers Mutual knew, in the most vivid way, of the charges against Julien by David and his insurers. As between Jewelers Mutual

and Julien, that satisfied the notice requirement. Acquiescence thereafter in Julien's defense of David's third party complaint was at the peril of Jewelers Mutual either as to the outcome or its possible binding consequence under familiar principles exemplified in, e. g., Washington Gaslight Co. v. District of Columbia, 1896, 161 U.S. 316, 329–330, 16 S.Ct. 564, 40 L.Ed. 712, 719–720; B. Roth Tool Co. v. New Amsterdam Casualty Co., 8 Cir., 1908, 161 F. 709, 712; Royal Ins. Co. v. St. Louis-San Francisco Ry. Co., 8 Cir., 1923, 291 F. 358; Aetna Life Ins. Co. of Hartford, Conn. v. Maxwell, 4 Cir., 1937, 89 F.2d 988, 991 (dictum); 29 Am.Jur., Insurance § 1084 (1940).

pressing practical needs of the jewelry business and the parenthetical exception is the block jeweler underwriter's way of taking cognizance of it.

Nothing in Marshall v. World Fire & Marine Ins. Co., 9 Cir., 1945, 149 F.2d 902, or our prior case of St. Paul Fire & Marine Ins. Co. v. Garza County W. & M. Ass'n, 5 Cir., 1937, 93 F.2d 590, compels us to disregard these plain words or construe them in any different way. In Marshall the jewelry lost was that under coverage (B), see note 3, supra, as "property * * * delivered or entrusted to the Assured, belonging to others who are not dealers * * *." Marshall v. World Fire & Marine Ins. Co., supra, 149 F.2d at page 904. As analyzed above, this coverage is direct indemnity for the non-dealer-bailor as a third party beneficiary. Under the block jeweler policy the underwriter's liability was not that of legal liability of the assured, but rather the direct obligation to pay. As such, it did not come within the parenthetical exception found in the policy. Our St. Paul case merely involved the construction of a particular insurance contract. The policy expressly provided that "this insurance does not cover any cotton on which the *owner* [of the cotton] has other insurance which would attach * * *." St. Paul Fire & Marine Ins. Co. v. Garza County W. & M. Ass'n, supra, 93 F.2d at page 591. (Emphasis supplied.) We found as to one lot of cotton that the "owner" had procured his own insurance and the clause by its own terms applied; as to another lot we held that insurance procured by the mortgagee-pledgee, even though for the benefit of the owner, was not such insurance. The important thing is that we were dealing with the words used, and they are not the same words we deal with here. Nor are they the equivalent.

Finally, concerning the contention that the policy was breached by failure to maintain a detailed and itemized inventory it is sufficient to say that we regard as amply supported the fact-legal conclusion of the District Court that there was substantial compliance. The same may be said of all other contentions whether properly before us or not. We find them of no merit.

Affirmed.