**MORRISON GRAIN COMPANY, INC., a corporation, Plaintiff,**

v.

**UTICA MUTUAL INSURANCE COMPANY, a corporation, and Kearney Chemicals, Inc., a corporation, Defendants.**

Nos. 75–834 Civ. T–K and 76–122 Civ. T–K.

United States District Court,
M. D. Florida,
Tampa Division.

Dec. 22, 1977.

Supplemental Findings of Fact
Feb. 23, 1978.

David G. Hanlon, Shackleford, Farrior, Stallings & Evans, Tampa, Fla., for plaintiff.

Nathaniel G. W. Pieper, Fowler, White, Gillen, Boggs, Villareal & Banker, Tampa, Fla., for Kearney Chemicals, Inc.

Jack C. Rinard, Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., for Utica Mutual Ins. Co.

KRENTZMAN, District Judge.

These admiralty cases were consolidated and tried to the Court.

In No. 75–834 Civ. T–K Morrison Grain Company, Inc. (Morrison) sues Utica Mutual Insurance Company (Utica) for damages resulting from Utica's alleged breach of its contract of insurance on certain bagged urea, and Morrison sues Kearney Chemicals, Inc. (Kearney) for breach of a warranty of fitness of the bagged urea for shipment, and a breach of the obligation to provide all risk insurance coverage on the bagged urea. '

Utica contends that the cause of the injury or damage sustained by Morrison was the insufficiency of the bags in which the urea was shipped, alleges that Kearney misrepresented the quality of the bag to be used and denies liability either to Morrison or Kearney.

In No. 76–122 Civ. T–K Kearney sues International Affiliates, Inc., (International), Cambridge Shipping Co., Inc., Ltd. (Cambridge), and M/S Aida, *in rem* and *in personam* for contract and cargo damage.

The Court has considered the matters in the file, including the pretrial stipulation, the evidence submitted and received at trial, and the post trial memoranda and proposed findings submitted by counsel, and being advised, finds as follows:

## FINDINGS OF FACT

1. That at all material times, Morrison Grain Company, Inc. was and is a corporation organized and existing under the laws of the State of Kansas with its principal office and place of business at the Board of Trade Building, Salina, Kansas.

2. That at all material times defendant Kearney Chemicals, Inc. was and is a corporation organized and existing under the laws of the State of Delaware, licensed to do business in the State of Florida and having offices in the City of Tampa, Florida.

3. That at all material times defendant Utica Mutual Insurance Company was and is a corporation organized and existing under the laws of the State of New York with its principal office in the City of Utica, New York.

4. During all the times herein mentioned International Affiliates, Inc. was and is a corporation with a principal office and place of business at 147 West 35th Street, New York, New York.

5. During all the times herein mentioned Cambridge Shipping Co. Ltd. was and is a corporation with no office or place of business within this district.

6. Both were the owners and operators of the M/S Aida and acted as common carriers by water of the goods hereafter referred to which were received by them and the vessel for shipment on said vessel.

7. This Court's jurisdiction is based upon diversity of citizenship and the fact that the matter in controversy exceeds the sum of $10,000, exclusive of interest and costs, and is within the admiralty and maritime jurisdiction of this Court.

8. Kearney International desired to obtain broad insurance protection to cover its activities in international trading and in August/September of 1973 went to Richard Hummel of Fairfield and Ellis, an independent insurance broker. An all risk policy was sought.

9. Fairfield and Ellis developed an insurance package using a Utica Mutual/Mutual Marine Office form, which open cargo Policy MMO–7340 provides for all risk coverage in the following terms:

"7. *Insuring Conditions*

All goods are insured against:

All risks of physical loss or damage from any external cause whatsoever . . "

10. Utica Mutual Insurance Co. was at all times represented by Mutual Marine Office and its employees Brice Leon, Steven Timo, and Mike Fischetti. Mutual Marine Office is the underwriting manager for Utica.

11. A binder was executed by Mutual Marine Office effecting insurance on September 21, 1973. The open cargo policy, although dated April 24, 1974, was effective as of the binder date. The binder was to detail the essential conditions of the policy to be issued. The policy was delivered to insured Kearney International in Tampa, and describes the insured as "Kearney International Chemicals, Inc., 100 West Kennedy Boulevard, Tampa, Florida".

12. On October 26, 1973 Kearney Chemicals, Inc. contracted to sell a quantity of bagged urea to Morrison Grain Company, Inc. For purposes of this case, Morrison Grain Company and Agro Marketing Co. will be treated or referred to as a single entity as the evidence shows all to be related commercially and involved in this transaction. Terms were amended as to price, quantity and container prior to delivery at Gulfport, Mississippi, and Morrison paid Kearney for 5,500 net metric tons of urea in accordance with Kearney's invoices.

13. The terms of this agreement were C.I.F. (i. e. Kearney Chemicals to provide cargo, insurance and freight).

14. Subsequent to the initial intent letter and initial agreement, Kearney and Morrison Grain agreed on numerous changes involving price, quantity, freight, size of bag, and imprint on bag. This included changing the description of the bags to "50 kilo bags of polyethylene about 0.3MM thickness."

15. Kearney Chemicals, Inc. bought the cargo to be supplied under its contract to Morrison from International Affiliates, Inc. which in turn purchased the urea from Azoexport Bucharest, Romania.

16. Morrison Grain Company, Inc., Cropland Chemical Co., Inc. and Morrison Grain Company, Inc. were joint venturers in importing a shipload of the urea from Constantza, Romania.

17. To insure this transaction, Kearney was named an additional insured under the Utica open cargo policy and Mutual Marine Office issued a special marine policy.

18. The Mutual Marine Office form special marine policy provides that "Kearney Chemicals, Inc." is the assured, that the policy is subject to the "conditions of Open Policy MMO–7340", and the cargo insured is described as "5500 metric tons 46% urea packaged in 50 kilo polyethylene bags." Any loss was payable to assured or order. The special marine policy is to indemnify the insured or his consignee for any loss under the policy. It is an all risk policy.

Special policy # 1 is on a printed form containing a conventional "perils of the sea" clause.

Policy MMO–7340 contains no terms or conditions which limit or qualify the "all risks" clause of special marine policy # 1.

19. The special marine policy was delivered to Kearney at its Tampa, Florida office.

20. Utica has offered evidence that various representations were made by Richard Hummel of Fairfield and Ellis about the bags to be used for the shipment. However, the special marine policy on the Mutual Marine Office form prepared for Utica and signed by Steven Timo, vice president in charge of underwriting of Mutual Marine

Office contains no description or specifications for the bags. Indeed, as stated by MMO's Timo:

"If you wrote a policy conditioned on a specific thickness of bags, or conditioned on any problem on container, it is normally included in the policy."

21. Timo admits the special marine policy in question contains no language specifying the strength or thickness of the bags nor any warranty by the insured that the bags will be of a given thickness or strength.

22. Mutual Marine Office reinsured 50% of the risk with another reinsurance broker and the reinsurer was given no information by MMO about the fitness or strength of the bags and merely describes the commodity as "5500 metric tons urea packed in 50 kilo polyethylene bags."

23. Kearney paid a premium of $8,244.

24. To transport the cargo, International Affiliates, Inc. chartered the M/V Aida and the ship went to load in Constantza, Romania.

25. 5500 metric tons of urea granules packaged in 50 kilo net bags of polyethylene about .3MM thickness were supplied by Azoexport Bucharest, Romania and were loaded aboard the M/V Aida by the shipper in early March, 1974.

26. A clean on board bill of lading was signed by the master showing the cargo to be urea granules in "110,000 polyethylene bags about 0.3MM thickness of 50 kilo net." The stowage plan shows 110,000 bags on board.

27. The vessel sailed for Gulfport and encountered heavy weather.

28. In the meantime, Kearney endorsed the special marine policy and the bill of lading to Morrison and funds were transferred from Morrison's bank to the account of Kearney Chemicals, Inc. in payment of the cargo purchase.

29. The letter of credit is dated October 31, 1973. The letter of credit was amended on January 23, 1974 to describe the cargo exactly as was delivered by Kearney to Morrison.

30. The vessel Aida sailed to Gulfport, Mississippi, as directed by Morrison, arriving on April 9, 1974, Ryan-Walsh Stevedoring Company commenced discharge on that date and it was discovered that the cargo and its containers were damaged. Discharge was completed April 19, 1974.

31. Many of the bags were ruptured, distorted and damaged. There was loose, caked and partially dissolved urea between, among and on top of the layers of bags in several holds, and many of the bags were wet and slippery, thus causing additional damage upon unloading when the bags were dropped or slid off of the unloading pallets. A large quantity of cargo in the # 4 hold had dissolved and simply melted away.

32. The evidence established that the damage resulted from the following:

(A) During loading, spillage of urea granules was left between the layers of bags, causing bags to be wet at discharge due to the hydroscopic nature of the urea granules;

(B) Improper stowage permitted the bags to be piled in a haphazard manner and failure to clean up spillage occurring during loading;

(C) The M/V Aida was not fitted with sweat battens nor was proper dunnage installed to protect the bags from metal parts;

(D) The bags of urea were in contact with the ship's shell plates (some of which were covered with paper which was inadequate), frames, stanchions, and other metal parts, with the result that bags were distorted and damaged;

(E) The # 4 lower hold was flooded to a depth of about 9–10 feet due to the crew's negligence in not properly securing the forward tank manhole cover soaking the cargo in that space.

(F) Utica's surveyor Rees had a sample of urea tested and the laboratory analysis indicated exposure to salt water. Urea, mixed with water, will dissolve.

(G) In summary, the M/V Aida simply was in unsuitable condition to safely

carry a cargo of bagged goods, and with respect to the # 4 lower hold, was unsuitable to carry any type of cargo.

33. Ryan-Walsh Stevedoring Company ship superintendent Thomas Taylor was directly in charge of the discharge work. In Taylor's view, the cargo damage was attributable to a combination of flooding in the # 4 hatch, spillage at the loading port which was not cleaned up, lack of dunnage, lack of sweat battens and poor stowage permitting compaction/distortion of the bags around ribs, stanchions and steel protrusions.

If the bags of urea had been properly stowed in a ship properly fitted, the discharging stevedore would have expected about one to two percent damage during discharge.

34. 96,672 bags were discharged in sound condition both as to content and bag, and were shipped to Morrison's customer Cargill in 106 railcars satisfactorily. Cargill paid the full pre-shipment agreed price and had "absolutely no complaints about the bags".

Another 566.90 short tons in bulk were shipped to Morrison's plant at Meredosia, Illinois.

35. Hummel of Fairfield & Ellis, at the request of Mutual Marine Office's Leon/Utica appointed surveyor Rees to act for Utica and Rees attended periodically during discharge in Gulfport. Rees acted for the cargo underwriter.

36. Rees and Morrison's Trowbridge agreed on a valuation and method of disposing and salvaging the bulk damaged cargo.

37. Utica arranged for Sherman & Skinner, a testing laboratory, to test one polyethylene bag from the M/V Aida shipment. Only one bag out of the total shipment of 110,000 (i. e. Sherman & Skinner were asked to test .00099% or 99/100,000's of the total.) Mr. Gagnon admitted the sample given to him was not a random sample from a scientific and engineering standpoint and that his conclusions were based on his examination of the single bag. "I tested that which was available to me and it was only one bag sir."

38. Over 87.8 percent of the bagged shipment was outturned in satisfactory condition despite the unquestionable inadequacies of the M/V Aida.

39. A shortage at the time of delivery and damage at the time of delivery were established by positive evidence.

40. The evidence does not establish that the urea bags were insufficient for the purpose used or that their quality was misrepresented.

41. That Morrison established its loss and damage as follows:

| | |
|---|---|
| Stevedoring charges due to condition of cargo on board the M/V Aida | $ 87,937.50 |
| Bulking and loading junked urea | 7,613.97 |
| Cleaning out ship to reclaim wet bulk material in ship | 5,158.31 |
| Loading out urea into rail cars | 30,217.00 |
| Total for discharging and loading out in its damaged condition | $130,926.78 |
| LESS: Amount of stevedoring and loading out charges if cargo had not been damaged | 54,268.00 |
| Morrison's extra cost due to damaged condition of cargo | $ 76,658.78 |
| Product not delivered from the M/V Aida, 143.6 short tons at $170.35 per ton, plus 10% per policy terms, or $187.38 per ton | 32,139.42 |
| Salvaged product: Fair bulk, 301.10 short tons, value on the dock | 39,143.00 |
| Wet bulk, 207.20 short tons, $43.33 per ton value on the dock | 8,977.98 |
| Junked bulk, 58.60 short tons at $10 per ton value on the dock | 586.00 |
| Total | $ 48,706.98 |

| | | |
|---|---|---|
| | Total from preceding page brought forward | $ 48,706.98 |
| | Fair market value of 566.9 short tons at $187.38 per ton on the dock (at Gulfport in good condition) | $106,225.72 |
| LESS: | Salvage value of damaged urea at Gulfport | 48,706.98 |
| | Loss sustained | $ 57,518.74 |

RECAPITULATION:

| | | |
|---|---|---|
| | Stevedoring, extra costs | $ 76,658.78 |
| | Unrecovered product (not delivered) | 32,139.42 |
| | Loss on salvage | 57,518.74 |
| | Total loss | $166,316.94 |
| LESS: | ½ of 1% deductible pursuant to policy | 831.58 |
| | NET LOSS | $165,485.36 |

---

42. That Morrison is entitled to interest on the amount of its loss from April 19, 1974 to the date of judgment.

### CONCLUSIONS OF LAW

1. That the Court has jurisdiction of the subject matter and the parties.

2. That Utica insured Morrison under an "all risk" cargo insurance policy effective March 20, 1974.

3. That 13,328 bags of urea were extensively damaged while on board the M/V Aida by reason of negligent spillage during loading, improper stowage, negligent failure to provide sweat battens, and the negligent flooding of # 4 lower hold, all of which were covered by the policy issued by Utica.

4. Under an all risk policy such as involved here, the burden of proving lack of coverage because the loss was caused by an excluded risk falls on the underwriter. *Jewelers Mutual Ins. Co. v. Balogh*, 272 F.2d 889 (5th Cir. 1959); *Redna Marine Corp. v. Poland*, 1969 A.M.C. 1809, 46 F.R.D. 81 (S.D.N.Y.1969).

The court in *Welded Tube Co. v. Hartford Fire Insurance Co.*, 1973 A.M.C. 555 (E.D. Pa.1972) well discusses this point at page 564:

"The open marine insurance policy covered all risks of physical loss or damage except for certain excluded risks. An all risk policy is defined as: 'a policy against "all risks", the words being inserted in writing, ordinarily covers every loss that may happen except by the fraudulent acts of the insured. Accordingly, a policy insuring against all marine risks is just as binding and effectual as if the risks were specified in detail.' 11 Couch on *Insurance* (2d ed.), Section 43:2 (1963).

Under an all risk policy the insured must prove that the cargo was in good condition when the policy attached and that the cargo was damaged when unloaded from the vessel. Buglass, *Marine Insurance Claims* (1963) at 11. The presence of exceptions does not alter either the characterization of the policy as an all risk or the insured's burden of proof. Indeed, the insurance policy in *Jewelers Mutual Ins. Co. v. Balogh*, 272 F.2d 889 (5th Cir. 1959), contained an extensive list of exceptions. Nonetheless, the court held that the insured only had to prove the existence of the loss; the defendant then had the affirmative defense of establishing that the loss was caused by one of the enumerated exceptions. See *Redna Marine Corp. v. Poland*, 1969 A.M.C. 1809, 46 F.R.D. 81 (S.D.N.Y.1969). I, therefore, find that Hartford's open marine insurance policy, is an all risk policy and that Hartford had the burden of proving that the loss was caused by the excluded risk."

The burden is on underwriter to show exception to coverage. *Northwestern Mutual v. Linard*, 498 F.2d 536 (2d Cir. 1974).

"All risk" covers every conceivable loss or damage except when occasioned by willful or fraudulent acts of the insured. *Sun Ins. Office v. Clay*, 133 So.2d 735 (Fla. 1961).

In determining the validity of a cargo insurance claim under an all risks policy, the Court in *Redna Marine Corp. v. Poland*, 1969 A.M.C. 1809, 46 F.R.D. 81 (S.D.N.Y. 1969) stated at page 1814, 46 F.R.D. at page 86, 87:

"The policy in suit is an 'all risks' policy. Such a policy provides coverage which insures against any loss without putting upon the insured the burden of establishing that the loss was due to a peril falling within the policy's coverage. Although there may be exceptions to such coverage, as for a defect inherent in the subject of the insurance, it is incumbent upon the underwriter to demonstrate that the exception applies. *Jewelers Mutual Ins. Co. v. Balogh*, 272 F.2d 889 (5th Cir. 1959) . . .

It is well established that where negligence, even on the part of employees of the insured, causes a loss, that loss is fortuitous and within the coverage of all risks insurance. *C. H. Leavell & Co. v. Fireman's Fund Insurance Co.*, 372 F.2d 784 (9th Cir. 1967); *New York, New Haven and Hartford R. R. Co. v. Gray*, 240 F.2d 460 (2d Cir.) cert. denied, 353 U.S. 966, 77 S.Ct. 1050, 1 L.Ed.2d 915 (1957); *Associated Engineers, Inc. v. American National Fire Ins. Co.*, 175 F.Supp. 352 (N.D.Cal.1959)."

Utica has failed to prove an exception to coverage.

5. Morrison's recourse and remedy is against Utica Mutual Insurance Company, and Kearney Chemicals, Inc. is not liable to Morrison Grain.

As stated in *York-Shipley, Inc. v. Atlantic Mutual Insurance Company*, 474 F.2d 8 (5th Cir. 1973), "Article 2, Section 320 of the Uniform Commercial Code defines the term 'CIF' to mean 'that the price includes in a lump sum the cost of goods and the insurance and freight to the named destination . . .' Section 320 also spells out the duty of the seller under a CIF designation contract: (1) he must put the goods into the possession of a carrier at the port of shipment and obtain a bill of lading, (2) load the goods and obtain a receipt from the carrier showing that the freight has been paid, (3) obtain a policy of insurance covering the goods while in transit, (4) prepare an invoice of the goods and procure any other documents required to offset shipment or comply with the contract, and (5) forward and tender with commercial promptness all the documents in due form and with any endorsement necessary to perfect the buyer's rights." Under the UCC, as well as at common law, title to goods shipped CIF passes upon their delivery to the carrier.

The CIF terms merely allocate risk of loss of goods in transit as between buyer and seller. *Cummins Sales and Service Inc. v. London and Overseas Insurance Co.*, 476 F.2d 498 (5th Cir. 1973).

When goods are sold on a CIF basis, if loss occurs, the buyer's recourse is to make claim under the insurance policy. *Petroleo Brasileiro v. Ameropan Oil Corp.*, 372 F.Supp. 503 (E.D.N.Y.1974).

6. Morrison is entitled to judgment against Utica Mutual under the all risk policy as the insurance policy covered the risk and loss sustained.

7. Morrison has sustained its burden of proof as to the liability in damages, and Utica is liable to Morrison under the terms of the insurance contract in the sum of $165,485.56 plus interest at six percent (6%) from April 19, 1974.

8. Morrison is entitled to attorney's fees from Utica under the terms of Florida Statute 627.428.

9. Utica has not established its misrepresentation claim against Kearney.

10. Kearney Chemicals, Inc. is entitled to recover against Utica Mutual on its counter-claim and its damages are its reasonable attorney's fee in defending this suit brought by Morrison.

The Utica Mutual insurance policy which shows insured Kearney Chemicals, Inc. was delivered to Kearney Chemicals, Inc. at its home office in Tampa, Florida.

Kearney tendered its defense to Utica and Utica had the opportunity to avoid its exposure to pay for Kearney's attorney's fees.

Utica refused to pay the claim and, Morrison and Kearney Chemicals, Inc. were forced to resort to litigation. The purpose of Florida Statute 627 is to persuade underwriters such as Utica Mutual to pay valid claims in a timely manner without the need for the insureds to resort to litigation. That statute provides:

"Upon the rendition of a judgment or decree . . . against an insurer and in favor of an insured or the named beneficiary or a third party beneficiary under a policy or contract executed by the insurer, the trial court . . . shall adjudge or decree against the insurer and in favor of the insured or beneficiary a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the suit in which the recovery is had." Florida Statute 627.428.

■ This provision is part of the public policy of Florida and its purpose is to discourage the contesting of policies in Florida courts and to reimburse successful beneficiaries reasonably for their outlays for attorneys fees when suit is brought against them or they are compelled to sue in Florida courts to enforce their policies. *Feller v. Equitable Life Assur. Soc. of U. S.*, 57 So.2d 581 (Fla.1912). The purpose of requiring unsuccessful insurers to pay attorneys' fees is to encourage the insurance company to pay valid claims without undue delay. *Meeks v. State Farm Mutual Auto Insurance Co.*, 460 F.2d 776 (5th Cir. 1972).

■ The test whether a successful claimant is entitled to recover his attorneys' fee is whether the insured did or did not wrongfully withhold payment of the proceeds of the policy and the fact that the insurer's refusal to pay the amount owed by it under the terms of its contract of insurance was in good faith and on reasonable grounds does not relieve it from the liability for payment of attorneys' fee. *Cincinnati Ins. Co. v. Palmer*, 297 So.2d 96 (Fla.App.1974).

Thus, Section 627.428 of the Florida Statutes provides for recovery of an attorney's fee to be included in the judgment rendered for Kearney Chemicals, Inc. in the case.

11. Upon application and hearing, if required, the Court will fix reasonable attorneys' fees.

12. Costs will be taxed by the Clerk in accordance with the Rules.

13. Separate judgment will be entered by the clerk.

IT IS SO ORDERED at Tampa, Florida this 22 day of December, 1977.

## SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

On December 22, 1977 the Court entered its findings of fact and conclusions of law in the above cases. The following findings of fact and conclusions of law are supplemental to the December 22, 1977 opinion and are hereby incorporated into the original findings.

On February 21, 1978 the Court held a hearing on motions for attorney fees filed by Morrison Grain and Kearney Chemicals. The Court at the same time also heard and denied Utica Mutual's motion for reconsideration of the award of attorney's fees.

## FINDINGS OF FACT

1. Counsel for Morrison Grain Company expended a total of 305 hours in the preparation and trial of these cases. Ten percent of that time was directed to the claim against Kearney Chemicals and 90 percent of the time was directed to the suit against Utica Mutual. Thus counsel for the plaintiff, Morrison Grain, is entitled to recover $27,450 in attorney's fees against Utica Mutual. [305 hours minus ten percent (30.5 hours) = 274.5 hours multiplied by $100 per hour].

2. Counsel for Kearney Chemicals, Inc. expended a total of 270 hours in the prepa-

ration and trial of these cases. Ten percent of that time was directed at the claim posed by Morrison Grain Company and 90 percent of the time was directed at the cross-claim against Utica Mutual Insurance Company. Thus counsel for Kearney Chemicals, Inc. is entitled to recover $24,300 in attorney's fees against Utica Mutual Insurance Company. [270 hours minus ten percent (27 hours) = 243 hours multiplied by $100 per hour].

## CONCLUSIONS OF LAW

1. The first paragraph of Section 10 of the Conclusions of Law entered on December 22, 1977 is amended to read:

Kearney Chemicals, Inc. is entitled to recover against Utica Mutual on its cross-claim and its damages are its reasonable attorney's fee in imposing policy coverage on Utica Mutual.

2. The third paragraph of Section 10 of the Conclusions of Law is stricken.

3. On September 21, 1976 the Court granted Kearney Chemicals' motion for summary judgment against the defendant, International Affiliates, on the issue of liability in Case No. 76–122 Civ. T–K. Accordingly, the Clerk of the Court is directed to enter judgment for Kearney Chemicals, Inc. and against International Affiliates for costs alone.

4. On November 22, 1976 the Clerk of the Court entered default in favor of Utica Mutual Insurance Company against International Affiliates in Case No. 76–122 Civ. T–K. Accordingly, the Clerk is directed to enter judgment for Utica Mutual and against International Affiliates for $165,485.56 in damages, plus 6 percent interest from April 19, 1974, $51,750 in attorney's fees, and costs.

5. The claims of Kearney Chemicals and Utica Mutual Insurance Co. against Cambridge Shipping Co., Inc. and the M/S Aida in No. 76–122 Civ. T–K are hereby dismissed for lack of jurisdiction.

IT IS SO ORDERED at Tampa, Florida this 23 day of February, 1978.