**PEOPLES LOAN & FINANCE CORPORATION, Appellant,**

v.

**Raymond LAWSON, Appellee.**

**No. 17745.**

United States Court of Appeals
Fifth Circuit.

Nov. 3, 1959.

Rehearing Denied Dec. 15, 1959.

Cameron, Circuit Judge, dissented.

Clinton J. Morgan, Rome, Ga. (Wright, Rogers, Magruder & Hoyt, Rome, Ga., of counsel), for appellant.

Oscar M. Smith, Rome, Ga. (Matthews, Maddox, Walton & Smith, Rome, Ga., of counsel), for appellee.

Before HUTCHESON, CAMERON and JONES, Circuit Judges.

HUTCHESON, Circuit Judge.

Brought by Raymond Lawson, the appellee, against Peoples Loan & Finance Corporation, the appellant, and two of appellant's agents, the suit was in trover for the wrongful conversion by the appellant and its agents of eleven automobiles owned by him. The damages sought were the market value, alleged as $13,095, of the automobiles and the reasonable hire thereof from the date of conversion. The appellant denied that plaintiff was the owner of the automobiles described in the complaint, alleged a value of $9960.00 for ten of them, and asserted by way of special defense that title to the automobiles had vested in appellant or appellant was an innocent purchaser, against whom Lawson was estopped to assert his title, if any.

Thereafter, appellant, alleging that Georgia Casualty and Surety Company, which had given its check to plaintiff for the larger part of the loss under a loan receipt, was a real party in interest, moved to add it as a party plaintiff, and the motions denied, there was a trial on the merits [1] before a jury resulting in a verdict and judgment for plaintiff for

---

1. Stated, as they must be, in the light most favorable to the jury verdict, these are the material facts:

On August 1, 1957, Douglas Dennard, president of Douglas Motor Sales, Inc., a used car dealer at Rome, Georgia, went to Chattanooga, Tennessee, where he purported to purchase from Raymond Lawson, dba Chattanooga Auto Auction, the eleven automobiles in suit. Dennard gave

$11,655.00, as the value of the automobiles, and $2,369.85, as their rental value between the time of conversion and the time of trial.

Lawson certain checks drawn on the Bank of Dalton, which, had they been honored and paid, would have paid the purchase price of the automobiles.

Lawson thereupon delivered to Dennard a written document as to each automobile in which it was specifically provided that the title to each automobile would remain in the seller, i. e., Chattanooga Auto Auction, in which name Lawson did business, until "any check or draft given for the sale price of said vehicle, or any part of the same, has been honored and paid in full". These documents further provided that "until said check or draft shall have been honored and paid in full, title to the above described vehicle shall be retained by the seller and not pass to buyer nor shall this sale be considered consummated. * * "

The checks given to Lawson by Dennard for the eleven automobiles were dishonored and Lawson was not paid for the automobiles. The automobiles were in possession of Lawson at the time Douglas was permitted to carry them away, following the giving of the checks by Douglas and the delivery of the eleven documents by Lawson.

Lawson testified that in his opinion the market value of each of the eleven automobiles from Aug. 1, to Aug. 10, 1957, was the sum shown under the heading "Sales Price," on the copy of the sales document for each car as shown by the eleven documents introduced in evidence as Plaintiff's Exhibit No. 1. These were also the prices which Douglas Motor Sales, Inc., which had its place of business at Rome, Georgia, had agreed to pay for the automobiles.

On Aug. 2, 1957, a representative of Douglas Motor Sales, Inc. one Branan prepared 11 notes and bills of sale to secure debt, by the terms of which Douglas Motor Sales, Inc. purported to convey the eleven automobiles in suit to appellant as security for loans of money made by appellant to Douglas. Branan took them to Dan Smith, a loan officer in the employ of appellant, and Smith issued appellant's check payable to Douglas Motor Sales, Inc. for $10,520.00, the amount of the loan.

Smith testified that Branan did not deal with anyone else at Peoples Loan and Finance Corp. in connection with the loans on the eleven automobiles, that Branan dealt only with him. He further testified that at the time he made this transaction with Branan, he "simply took those notes and made this check"; that he didn't ask anything about where the automobiles came from; that Branan didn't tell him anything about the automobiles; that he did not know of his own knowledge where the automobiles were; and that he accepted the notes from Branan "without knowing whether he actually had the cars there or not".

Appellant had been financing Douglas Motor Sales, Inc. since 1955. Charles N. McCoy was a vice-president and a stockholder in the appellant corporation. He had also been a vice-president and director of Douglas Motor Sales, Inc. since 1955. McCoy had been associated with appellant finance corporation since 1947. However, because of his "finance company affiliations", he found it necessary to resign as vice-president of Douglas Motor Sales, Inc. in writing on Aug. 2, 1957, the same day that appellant claims to have made the loans to Douglas on the automobiles in suit.

Appellant had information in its records on July 29, 30, and 31st and August 1, 1957, which, had it been consulted, would have led it to the discovery that Douglas Motor Sales, Inc. could not continue business due to financial difficulties.

On Aug. 5, appellant for the first time checked the identity of the automobiles which it had listed on its bills of sale to secure debt given to Dan Smith by Branan on August 1, by checking the motor numbers on the automobiles actually found on Douglas Motor Sales lot. It then took possession of the automobiles, sent them to Marietta, Georgia, and sold them to various purchasers.

Defendant-appellant, asserting reversible errors,[2] is here insisting that the judgment was wrong and must be reversed.

2. (1) The denial of its motion to add Georgia Cas. & Surety Co. as a party plaintiff;

(2) The denial of its motions to direct a verdict because (a) plaintiff failed to prove that it had ever had title to the automobiles; (b) because, if it had had title, the evidence established as matter of law that defendant was a bona fide purchaser and plaintiff was estopped to assert title against it; and (c) because there was insufficient competent evidence of value to support the verdict;

(3) The admission of evidence as to the value of the automobiles in Chattanooga and the charge of the court that the sales price at the auction there could be considered by the jury on the issue of value;

We do not think so. On the contrary, for the reasons hereafter briefly stated, we think the judgment was right and must be affirmed.

■ Appellant's first contention that payment by the insurance company, notwithstanding the loan receipt, was not a loan but a payment, and the company, as subrogee, should have been made a party to the suit, may be summarily disposed of. It is sufficient to say of it that the law is settled to the contrary and to refer in support to Luckenbach v. W. J. McCahan Sugar Rfg. Co., 248 U.S. 139, at pages 148–149, 39 S.Ct. 53, 63 L.Ed. 170, and to 39 Am.Jur., "Insurance", Sec. 1337, pp. 1002–3, 1959 Supp. p. 222. Cf. also Green v. Johns, 86 Ga. App. 646, 72 S.E.2d 78, and Augusta Broadcasting Co. v. United States, 5 Cir., 170 F.2d 199.

Appellant's reliance on United States v. Aetna Cas. & Surety Co., 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171, is entirely misplaced, both because that suit had to do only with the Anti-Assignment Act, R.S. 3477, 31 U.S.C.A. § 203, and because there no loan receipt was involved, and, as shown at page 382 of 338 U.S. at page 216 of 70 S.Ct.; it was held that the Surety Co., though it had paid without taking a loan receipt, was not an indispensable party. If, here it could be claimed that Georgia Casualty and Surety Company was a proper or necessary party, it certainly was not indispensable, and since its joinder would have ousted the jurisdiction of the court, the refusal to join it could not have been error.

■ The same summary disposition may be made of the claims: that plaintiff did not prove that it had ever had title to the automobiles; that there was insufficient competent evidence to support the verdict; and that the admission of evidence and the charge as to the value

(4) The claimed error in the charge that unless the defendant, at the time of making the loan, relied on the fact of actual possession of the cars by the sender, it could not assert the defense of estoppel.

and sales price of the automobiles at the auction in Chattanooga was error. This is so because, under the uncontradicted evidence, when Lawson sold the automobiles to Douglas, he did have the title and the case was tried on the theory that he had. Indeed, appellant, in its defense, alleged that "plaintiff Raymond Lawson, dba Chattanooga Auto Auction, sold to Douglas Motor Sales, Inc., in the normal and usual course of the business of said automobile company, the cars in question". Under the laws of Georgia, therefore, there was no real issue, either factual or legal, as to whether Lawson had title to the automobiles at the time Douglas, through whom alone appellant claims, purchased them from Lawson at Chattanooga. Conley v. Thornton, 81 Ga. 154, 7 S.E. 127.

■ In the light: of the verdict for only $11,655, the admission of the appellant in his pleadings that the value of the automobiles was $9960.00; of the evidence as a whole as to value; and of the liberal rules governing proof of value in Georgia and elsewhere,[3] it is little short of frivolous to assert that it was error to charge that the jury could consider evidence of sales prices and that, because of the insufficiency of proof as to value, a verdict should have been directed. Moreover, appellant put forward below no such ground for the direction of a verdict, and he cannot do it here.

This brings us to the storm center of the case, the error most strongly pressed and relied on, that a verdict should have been directed on the ground that the evidence established as matter of law that defendant was a bona fide purchaser and plaintiff was estopped to assert title against it.

On its part, appellant, quoting from Gouldman-Taber Pontiac, Inc. v. Thomas, 96 Ga.App. 279, 99 S.E.2d 711:

3. Grant v. Dannals, 87 Ga.App. 389, 74 S.E.2d 119; Farm Products Co. v. Eubanks, 29 Ga.App. 604, 116 S.E. 327; Frost & Co. v. Powell, 10 Ga.App. 95, 72 S.E. 719.

"Where a car is purchased by a check, later found to be worthless, and where such car is put into possession of the purchaser and is later sold by the original purchaser to an innocent purchaser for valuable consideration, trover will not lie for the original seller to recover the property."

and citing in support Capital Automobile Co. v. Ward, 54 Ga.App. 873, 189 S.E. 713; Blount v. Bainbridge, 79 Ga.App. 99, 53 S.E.2d 122; Wolfe v. Smith, 80 Ga.App. 136, 55 S.E.2d 675; and Southern Discount Co. v. Elliott, 86 Ga.App. 50, 70 S.E.2d 605; asserts that the facts of this case bring it within the principle there laid down and require verdict and judgment for appellant.

Appellee, quoting from Cobb County, etc. v. Board of Lights, 211 Ga. 535, 87 S.E.2d 80, at page 84:

"Before an equitable estoppel will rise, the party asserting it must have relied and acted upon the declarations or conduct of the party sought to be estopped and not on his own knowledge or judgment."

and from East Atlanta Bank v. Nicholson, 83 Ga.App. 557, 63 S.E.2d 699, 701:

"The defendant did nothing to mislead or deceive the plaintiff to make the loans to Waters. The plaintiff relied upon nothing except Waters' word in making the loans. The defendant conferred no power upon Waters which was used to inflict the injury upon the plaintiff."

urges upon us that the case of Gouldman-Taber, supra, like the other cases relied on by appellant, does not state any different ruling, and that, under the evidence in this case, the verdict of the jury was amply supported, if not demanded.

Pointing to the facts: that plaintiff in his bill of sale expressly reserved title until the check was paid; that defendant did not see or ask to see the bill of sale or otherwise inquire about its terms; that it did not see or ask to see the automobiles; that it relied upon nothing that the plaintiff had done; that it simply accepted the application for the loan on the statement of the borrower; and that, under the law of Tennessee, where the sale was made, Edwards v. Central Motor Co., 198 Tenn. 50, 277 S.W.2d 417, as in Taylor v. Gill Equip. Co., 87 Ga.App. 309, 73 S.E.2d 755; Douglas Motor Sales, Inc. v. Cy Owens Inc., 99 Ga.App. 890, 109 S.E.2d 874 and generally elsewhere, the title to the car did not pass; appellee insists that, under the evidence, including especially the relation between appellant, the borrower, and Douglas, the insolvent lender, a case was made out fully supporting, if not demanding, the jury verdict.

■ A careful reading of the Georgia cases on the point, including particularly the Gouldman-Taber case, supra, relied on by appellant, and the East Atlanta Bank case, supra, relied on by appellee, leaves us in no doubt that, under Georgia law, the equities here are with the appellee, and the verdict of the jury is amply supported by the evidence, perhaps indeed demanded by it.

In the well reasoned Gouldman-Tabor case, Judge Gardner, writing the opinion, gathers together and discusses other Georgia cases upon their particular facts. Stating that the principle relied on in the Gouldman case was first enunciated in the leading case of Capital Automobile Co. v. Ward, 54 Ga.App. 873, 189 S.E. 713, he relies strongly on it as correctly stating the rule and its basis. It is interesting to note that Judge McIntyre, who wrote the opinion in that case, wrote the opinion in the later case of East Atlanta Bank v. Nicholson, on which appellee relies, and that, in the latter opinion, he stated that there was nothing in the earlier opinions contrary thereto.

We think the judgment was right and that it must be affirmed.

Affirmed.

CAMERON, Circuit Judge (dissenting).

I am unable to join my Brethren in deciding that, under the facts of this case, the court below correctly held that

the Georgia Casualty & Surety Company was not an indispensable party when it owned ninety-five per cent of the claim sued on by Lawson. The action was begun and prosecuted by Lawson as sole plaintiff and he was permitted to recover the five per cent of the fund to which he was entitled, along with the ninety-five per cent to which the insurance company was entitled.

I am not unmindful of the tendency of statutes, as well as court decisions, to throw a mantle of anonymity around insurance companies which have become subrogated to the rights of their insureds by reason of having paid losses suffered by them. These decisions stem largely from the decision of the Supreme Court in Luckenbach v. W. J. McCahan Sugar Co., 1918, 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170. In that case the shipper of a consignment of sugar had been paid in full by the insurance company and the carrier by sea claimed that it was entitled to the full benefit of the insurance. When making the payment and in order to retain control of the litigation, the insurer took from the insured a "loan receipt" obligating the insured to pay back to the insurer any amount which might be recovered in the action against the shipper. The ship owners (along with the charterer) contended in the action brought in the name of the shipper "but for the sole benefit of the insurers" that the loan receipt was nothing but a sham and that the shipper had been paid in full and ought not to be permitted to maintain the action. The Supreme Court held otherwise, upholding the loan receipt device in these words (248 U.S. at pages 148–149, 39 S.Ct. at page 55):

"Agreements of this nature have been a common practice in business for many years. * * * It is clear that if valid and enforced according to their terms, they accomplish the desired purpose. They supply the shipper promptly with money to the full extent of the indemnity or compensation to which he is entitled on account of the loss; and they preserve to the insurers the claim against the carrier to which by the general law of insurance, independently of special agreement, they would become subrogated upon payment by them of the loss. The carrier insists that the transaction, while in terms a loan, is in substance a payment of insurance; that to treat it as if it were a loan, is to follow the letter of the agreement and to disregard the actual facts; and that to give it effect as a loan is to sanction fiction and subterfuge. But no good reason appears either for questioning its legality or for denying its effect. * * * *Whether the transfer of money or other thing shall operate as a payment, is ordinarily a matter which is determined by the intention of the parties to the transaction.* Compare The Kimball, 3 Wall. 37, 44, 18 L.Ed. 50. *The insurer could not have been obligated to pay until the condition of their liability*—i. e., non-liability of the carrier *had been established.* The shipper could not have been obliged to surrender to the insurers the conduct of the litigation against the carrier, until the insurers had paid. In consideration of securing them the right to conduct the litigation, the insurers made the advances. It is creditable to the ingenuity of business men that an arrangement should have been devised which is consonant both with the needs of commerce and the demands of justice." [Italics added.]

The reasons behind that holding are not present here. Lawson made claim soon after August 1, 1957 against Georgia Casualty & Surety Company for losses sustained by him growing out of worthless checks given him. These losses were paid in eleven drafts dated August 13, all of which had been converted to cash by August 21. Each of the drafts contained in its face "in full settlement of all claims as result of accident on August 1 at Chattanooga—Policy CT 1008;" and each draft bore the in-

scription above Lawson's endorsement of the name of Chattanooga Auction Company by Lawson, "The endorsement of this draft constitutes a release and receipt in full of the account as herein stated." These payments were made pursuant to the policy provision quoted in the margin.[1]

It is plain, therefore, that the policy held by Lawson was an indemnity policy and required immediate payment, and the drafts he endorsed certified that the amount received was in full payment of the money due him under the policy. These writings fixed the nature and character of the policy obligation and of its performance. The facts, therefore, differentiate the case from Luckenbach. In the quotation from that case supra the italicized words show that the insurer was under no obligation to pay the insured until the insured had litigated the question of the liability of the carrier; and the Insurance Company was liable only if the carrier was not. What the Supreme Court complimented was the ingenuity which led business men to make provision for a loan by the insurer to the insured during the period when the liability of the carrier was being litigated. The loan there had its genesis and its sole basis in the character of the insurance contract. There is no such basis in the insurance contract before us, which by its terms required *immediate payment* to the insured upon the filing of a proper claim.

The policy before us makes no mention of any advances by the insurer or of any possible loan to the insured, and provides no subrogation of the insurer to the insured's rights in event of any "advance." These facts distinguish the present case from those cited in the majority opinion and others from this Court which have been rendered recently.[2]

This action was begun, moreover, in the name of Lawson by the attorneys for Georgia Casualty on August 23rd. It was filed, not against the person who had given the bad checks (such as was done in Luckenbach), but against third persons, appellants here, who had come into the possession of the cars which the bad checks covered. Whatever rights Georgia Casualty had against these third persons were not such as were dealt with or were within the contemplation of the Luckenbach case where the loan transaction was approved.

It is further clear that the entire transaction between Georgia Casualty and Lawson was the *payment* of the amount due under its policy with Lawson of its entire liability of ninety-five per cent of his loss. The idea of the loan receipt seems not to have originated until December 9, when the defendant (appellant) began taking of the deposition of the Assistant General Claims Manager of Georgia Casualty, the responsible officer handling this transaction. At that time, the attorney for Georgia Casualty Company produced the loan receipt, and this was the first time the man who approved the drafts and authorized and supervised the payment of the policy liability had ever seen it or been advised that such a document was in existence. He even admitted that the loan receipt played no part in the Company's paying what it owed under its policy.[3]

---

1. "The Company agrees to indemnify Raymond Lawson d/b/a Chattanooga Auction of Chattanooga, Tenn., against pecuniary loss owing to checks given by purchasing dealer endorsed or guaranteed by the assured."

   And the further policy provision: "Any losses for which the Company may be liable *shall be payable immediately* upon receipt by the Company of proof of claim provided above."

2. E. g., Celanese Corp. of America v. John Clark Industries, Inc., 5 Cir., 1954, 214 F.2d 551; and United Services Automobile Ass'n v. Russom, 5 Cir., 1957, 241 F. 2d 296, 301.

3. When the officer of Georgia Casualty was giving his deposition he made the following answers:

   "Q. When and from whom did Georgia Casualty and Surety Company obtain that loan receipt?

   "A. Georgia Casualty and Surety Company received it today from Mr. Smith [its attorney]—where he got it, I don't know."

All of these facts were established without contradiction. Under the test set forth in the italicized language from Luckenbach supra it is clear that the "transfer" of the money in August to Lawson was intended by the parties to be payment of its unconditional obligation to him and not as a loan.

The question of parties is, in my opinion, under the facts of this case to be determined by the federal law as established by Rule 17, F.R.Civ.P., 28 U.S.C.A. An en banc decision of this Court construing that Rule has bearing on the question here presented. The District Court for the Northern District of Texas had denied a motion of the United States to dismiss from a personal injury suit the claim of the insurance company which had paid the injured parties and become subrogated to their claims.[4] This Court first reversed, with one Judge dissenting.[5] Upon rehearing by the Court en banc,[6] the Court permitted each of the three injured parties and also the insurance company to recover the respective amounts due them. In the course of the opinion it said that before F.R. C.P., an insurance company settling with an injured party in full could not maintain suit against the wrongdoer in its own name; but that under Rule 17, " * * * usees are no longer to be resorted to, but persons interested may ordinarily sue in their own names, and all parties in interest may be joined under Rule 19." The result was that all three injured parties and the insurance company, which had paid a part of their respective losses, could proceed in one suit.

This, it seems to me, is the genius of the law, as amplified by the Supreme Court in United States v. Aetna Casualty Insurance Co., 1949, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171. The question there was whether an insurance company could bring suit in its own name against the United States upon a claim to which it had become subrogated by payment to an insured who would have been able to bring the action. The court answered the question in the affirmative and discussed the evolution of the Rule, which was formerly Equity Rule 37 and now Rule 17(a). This is some of its language (338 U.S. at page 380, 70 S.Ct. at page 215):

> "If the subrogee has paid an entire loss suffered by the insured, it is the only real party in interest and must sue in its own name. * * * *If it has paid only part of the loss, both the insured and the insurer * * * have substantive rights against the tortfeasor which qualify them as real parties in interest.*

"Q. Now, Mr. McKay, in ascertaining whether these drafts shall be honored, the loan receipt plays no part in that, does it?

"A. It hasn't * * *"

From all of this it is clear that the loan receipt did not constitute a part of the file in the hands of the responsible officer of Georgia Casualty. It was produced at the deposition hearing by the attorney. It did not form a part of the transaction by which the company paid what it owed the insured, and it was not on a company form, but is a typewritten document, not mentioned in or contemplated by the policy. The only conclusion which can be drawn from these facts is that the loan receipt was a mere device utilized in connection with the exigencies of the litigation.

In denying the motion of appellant to bring the insurance company into the case as an indispensable party, the court stated: " * * * I must say, as always happens in these cases, counsel very understandably make a very desperate effort to get before the jury that the man has an insurance policy which is the ultimate aim of all this business. I don't think under the facts shown here that there is grounds for me to make Georgia Casualty a party plaintiff. Since they have elected not to be, I don't see why Mr. Lawson doesn't have the right to be the party plaintiff, and I so rule."

4. Hill v. United States, D.C., 74 F.Supp. 129.

5. United States v. Hill, 5 Cir., 171 F.2d 404.

6. 5 Cir., 174 F.2d 61, 62.

"In cases of partial subrogation the question arises whether suit may be brought by the insurer alone, whether suit must be brought in the name of the insured for his own use and for the use of the insurance company, or whether all parties in interest must join in the action. Under the common-law practice rights acquired by subrogation could be enforced in an action at law only in the name of the insured to the insurer's use, * * * Mr. Justice Stone characterized this rule as 'a vestige of the common law's reluctance to admit that a chose in action may be assigned, [which] is today but a formality which has been widely abolished by legislation.' * * * Under the Federal Rules, the 'use' practice is obviously unnecessary, as has long been true in equity * * * Rule 17(a) was taken almost verbatim from Equity Rule 37. No reason appears why such a practice should now be required in cases of partial subrogation, since both insured and insurer 'own' portions of the substantive right and should appear in the litigation in their own names.

"*Although either party may sue, the United States, upon timely motion, may compel their joinder. * * * The pleadings should be made to reveal and assert the actual interest of the plaintiff, and to indicate the interests of any others in the claim.*" [7] [Italics supplied.]

I think that, even under the Shields v. Barrow test, the joinder of the insurance company here should have been compelled. Lawson, owning, as pro tanto self insurer, only five per cent, permitted the insurance company owning ninety-five per cent to take hold of the litigation and conduct it in his name. That did not present a true situation, but was a sham. The pleadings did not "reveal and assert the actual interest of the plaintiff."

Granted that Lawson could have sued appellant for his five per cent and Georgia Casualty could have joined him or sued independently for its ninety-five per cent, we do not have such a situation as that here. This action, from the filing of the complaint to the rendition of the final judgment, was handled as a unitary claim owned in part by Lawson and in part by Georgia Casualty, each being the asserted owner of an undivided interest. This Court held as long ago as Seeley v. Cornell, 5 Cir., 1934, 74 F.2d 353, that an owner of an undivided interest in a chose in action could sue separately to recover his own interest without including the other joint owners. But it has held steadfastly that an action which involves the interest of a party not present cannot be prosecuted by or in the name of a party owning only a partial interest. See Hudson v. Newell, 5 Cir., 1949, 172 F.2d 848, where the general question of indispensable parties is discussed. These facts being undisputed and the interest of a party not before the Court being admittedly dealt with by the judgment and all of the proceedings leading to it, I think it was error for the court below to deny the motion to bring in Georgia Casualty as an indispensable party. I, therefore, respectfully dissent.

Rehearing denied; CAMERON, Circuit Judge, dissenting.

---

7. It is true that, in a note, the Supreme Court said that clearly such parties were not indispensable under Shields v. Barrow, 17 How. 129, 130, 139, 15 L.Ed. 158, which laid down the test that indispensable parties must have "an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience."