**UNITED STATES FIDELITY & GUARANTY CO., a corporation and Boston Insurance Company, a corporation, Plaintiffs,**

v.

**Irving T. SLIFKIN et al., Defendant.**

**Civ. A. No. 9575.**

United States District Court
N. D. Alabama, S. D.

Dec. 8, 1961.

Spain, Gillon & Young, Birmingham, Ala., for U. S. Fidelity & Guaranty Co.

Huie, Fernambucq & Stewart, Birmingham, Ala., for Boston Ins. Co.

Mudd, Baker & McDaniel and Schuyler A. Baker, Birmingham, Ala., for Irving T. Slifkin.

Bowers, Dixon, Dunn & McDowell, and Thomas F. McDowell, Birmingham, Ala., for Nathansohn-Lipschutz Co.

White, Bradley, Arant, All & Rose, and Frank H. McFadden and Charlotte R.

Kieffer, Birmingham, Ala., for Burkley Corp.

Martin, Vogtle, Balch & Bingham, Birmingham, Ala., for Maurice Kornreich Co. and Georges Ullmann.

LYNNE, Chief Judge.

Irving T. Slifkin was a diamond merchant with his place of business in Birmingham, Alabama. In the course of his business he received from time to time diamonds on consignment accompanied by memoranda, describing the stones and reciting certain conditions of the deliveries. On May 18, 1959, on his premises, he was robbed at gunpoint of merchandise owned by him and of consigned diamonds owned by Nathansohn-Lipschutz Company, Burkley Corporation, Maurice Kornreich Company, and Georges Ullmann, all of New York.

At that time Slifkin was insured against loss by robbery of property in the premises of his establishment separately by United States Fidelity and Guaranty Company and by Boston Insurance Company. Each of these policies contains a form of the so-called "in-trust-and-on-commission" clause and an "other insurance" clause. Each of the consignors at the time of the robbery had insurance effectively covering its respective losses of consigned properties. These policies also contain "other insurance" clauses. The consignors were compensated for their losses by their insurers under so-called "loan receipts", each of which recited in varying form substantially that the payment constituted a loan, repayable only to the extent of any net recovery by the consignor from Slifkin.

This action was instituted by Slifkin's insurers, by a bill of interpleader, naming as defendants Slifkin and each of the consignors and depositing in court the total proceeds ($20,000.00) of their policies with Slifkin. Each of the consignors has crossclaimed against Slifkin personally for any portion of their losses not recoverable out of such deposited proceeds.

The Applicable Law

To determine the applicable law, the conflict of laws rules of Alabama must be followed. Klaxon Co. v. Stentor Electric Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Alabama cases have recited repeatedly the precept stated in J. R. Watkins Co. v. Hill, 214 Ala. 507, 509, 108 So. 244, 245 (1926), that,

"[T]he nature, obligation, validity and interpretation of a contract are according to the laws of the state where made, or where performance begins, unless it is apparent that the parties manifest a mutual intention to the contrary, or unless it is to be performed in some other place, in which case the law of the other place and of performance will govern."

An insurance contract is made where the final act is performed which is necessary to its completion and to make it binding; and where the policy is countersigned and delivered by an agent with authority to do so is considered to be the place of making. 2 Couch, Insurance 2d §§ 16:3–16:6 (1959). Since the policies both of United States Fidelity and Guaranty Co. and of Boston Insurance Co. were not valid until countersigned by their agent in Birmingham, Wallace Cohen, both contracts are held to have been made in Alabama. There is no indication that performance was to be elsewhere. Consequently, Alabama law governs.

Slifkin's Personal Liability

Each of the consignors has crossclaimed against Slifkin to recover from him personally compensation for any losses to the consigned properties not recoverable by them directly from the proceeds of Slifkin's insurance policies with the United States Fidelity and Guaranty and the Boston Insurance companies. Since the court holds that the loss of the consigned property was not due to his negligence, Slifkin's personal liability therefor must be based on a contractual enlargement of his common-law liability. If there was an enlargement of liability,

it existed only by virtue of clauses in each of the consignment memoranda which substantially conform to the following clause from Burkley Corporation's memorandum No. 5004: "Risks of loss or damage from all hazards of any kind, with or without negligence on your [Slifkin's] part is yours." This statement appears on the face of each memorandum, accompanying delivery of the jewelry, in a short paragraph which is the only printed matter thereon. If it can be concluded that Slifkin agreed expressly or impliedly to these terms, they undoubtedly would enlarge his liability to that of insurer. See Constantian v. Mercedes-Benz Co., 5 Cal.2d 631, 55 P.2d 841 (1936); Allemania Fire Ins. Co. of Pittsburgh v. Keller Diamond Corp., Sup., 101 N.Y.S.2d 9 (Trial Term 1950), rev'd on other grounds, 278 App.Div. 899, 104 N.Y.S.2d 875 (1951); United States v. Seaboard Machinery Corp., 270 F.2d 817 (5th Cir., 1959); 6 Am.Jur., Bailments § 183 (1950). Cf. Reconstruction Finance Corp. v. Peterson Bros., 160 F. 2d 124 (5th Cir., 1947).

■ The memoranda terms are binding on Slifkin if either (1) he had actual knowledge thereof, or (2) he is chargeable with constructive notice thereof. Kravitz v. Parking Service Co., 29 Ala. App. 523, 526, 199 So. 727, cert. denied with opinion, 240 Ala. 467, 199 So. 731 (1940); Western Union Tel. Co. v. Prevatt, 149 Ala. 617, 43 So. 106 (1907); Martin v. Smith, 116 Ala. 639, 22 So. 917 (1897); 1 Williston, Contracts § 90A, at 292–93 (3d ed. 1957); Restatement Contracts § 70 (1932).

Slifkin's testimony on cross-examination at trial strongly suggests that he did have actual knowledge of the pertinent memoranda terms:

"Q. Were you ever a consignor of diamonds when you were on the road? Didn't you testify this morning you were on the road? What did you do? A. Travelling and selling diamonds and jewels.

＊　＊　＊　＊　＊　＊

"Q. You worked for what house at that time? A. Harry Weinstein.

＊　＊　＊　＊　＊　＊

"Q. Did you consign diamonds to retail merchants in their behalf? A. Yes, sir.

"Q. On memos? A. Yes, sir.

"Q. When you consigned diamonds, were the memos on which they were consigned similar to these? A. Yes, sir. All memos are similar.

"Q. Did they have similar language? A. Similar. Some of them worded a little differently, but essentially the same.

"Q. Did they all contain the risk of loss clause? A. I suppose they did." [Record, pp. 66–67]

Irrespective of Slifkin's actual knowledge, however, it would be difficult indeed to conclude that this is not a situation to which the doctrine of constructive notice is applicable. In Alabama and elsewhere knowledge of and assent to special contract terms have been implied in respect to a variety of transactions. See 1 Williston, Contracts §§ 90A–90D (3d ed. 1957); Western Union Tel. Co. v. Prevatt, 149 Ala. 617, 43 So. 106 (1907) (limitation of liability printed on reverse of telegraphic message blank); American Ry. Express Co. v. Henderson, 214 Ala. 268, 107 So. 746 (1926) (limitation of liability on bill of lading); Hartford Fire Ins. Co. v. Shapiro, 270 Ala. 149, 117 So.2d 348 (1960) (terms of liability insurance policy). Several cases of other jurisdictions are especially pertinent here. In Constantian v. Mercedes-Benz Co., supra, when the plaintiff rented furniture to the defendant, his so-called "delivery sheets" contained a printed statement that "renters [are] responsible for loss or damage of goods while in their possession." [5 Cal.2d 631, 55 P.2d 842.] Although the rented property was destroyed by a fire not caused by the lessee's negligence, he was held liable on the basis of the printed terms, the court stating in 55 P.2d at 843:

"We think it cannot be denied that 'the person receiving the * * * [delivery sheet] should as a reasonable man understand that it contained terms of the contract which he must read at his peril, and regard as part of the proposed agreement.' * * *

" 'It [the condition] was printed plainly on the face of the receipt. The whole paper is extremely brief. It was the duty of respondents to take note of its contents, if they had the opportunity, and their opportunity was ample. The presumption, therefore, is, that they did read it. Against this presumption there is no evidence, and none, we think, would have been admissible to show that the respondents had failed to do what their duty required them to do.' "

Allemania Fire Ins. Co. of Pittsburgh v. Keller Diamond Corp., supra, is even more in point. There a jeweler was held to be liable without negligence for the loss by theft of a bailed ring on the basis of printed terms on a memorandum receipt substantially identical to those in the present case.

▓ It is chiefly in respect to baggage, parcel room, and parking lot checks that the courts have been most reluctant to charge the recipient of the document with notice of its terms. See 1 Williston, Contracts § 90B, at 301–02; Kravitz v. Parking Service Co., supra; Goldstein v. Harris, 24 Ala.App. 3, 130 So. 313 (1930), cert. denied, 221 Ala. 612, 130 So. 315. The usual reasoning in these cases is that neither the nature of the transaction nor the appearance of the identification check warrant an assumption that a reasonable man would expect the document to contain special contract terms. The parking-lot type of case clearly is not in point here. Consignment of jewelry on memorandum was a serious business transaction to both the cross-claimants and Slifkin, and one with which Slifkin had had long and continuous experience. As in Constantian, the printed terms are very brief and quite

prominently displayed on the face of the documents. Accordingly, Slifkin should be held to have had notice of, and to have assented to, the enlargement of his liability by the terms of the memoranda. He is liable, therefore, to the consignors for their losses notwithstanding this court's conclusion that he was without negligence.

### Subrogation without Reference to Loan Agreements

Under the holding of United States v. Aetna Cas. & Sur. Co., 338 U.S. 366, 380–381, 70 S.Ct. 207, 215, 94 L.Ed. 171 (1949), an insurer which has paid the entire loss of its insured and is thereby entitled to subrogation "is the only real party in interest and must sue in its own name." Several questions arise in the present case as to whether the consignors' insurers, if it is deemed that they have "paid" rather than "loaned", are entitled to subrogation: (1) Inasmuch as the loss to consigned property was not due to Slifkin's negligence, may the insurers be subrogated to the consignors' rights against Slifkin under their *contracts*, by which it was agreed that risk of loss from *all* hazards was to be upon Slifkin? (2) Since under their "other insurance" clauses the consignors' insurers probably would not be fully liable for the losses of their insureds, were they by their payments "volunteers" and so precluded from subrogation? (3) What is the effect, if any, of the clauses in the consignors' policies providing for "conventional", as opposed to "legal" or "equitable", subrogation? All of the consignors' policies are New York contracts and questions of subrogation accordingly should be controlled by the available law of that state.

There is respectable authority for the proposition that the second of the above questions is controlled by the third—i. e., that by virtue of a "conventional" subrogation clause an insurer which has paid more than its proportionate liability is entitled to subrogation. The question is discussed thoroughly in Commercial Standard Ins. Co. v. American Employ-

ers Ins. Co., 209 F.2d 60, 64–66 (6th Cir., 1954), which similarly involved an insurer that had paid more than its pro rata share under an "other insurance" clause. Defendant insurer urged that plaintiff was a volunteer and therefore precluded from subrogation. After examining the principles of equitable or legal subrogation, the court stated in 209 F.2d at 65–66:

> "In the instant case, we are not concerned with legal or equitable subrogation, but with conventional subrogation, which arises from the express insurance contract entered into between the insured * * * and appellant insurer * * *. Conventional subrogation, as has been said, is based upon contract— in this case, upon a written contract. On the other hand, legal, or equitable subrogation is based upon the equities of the parties and arises by operation of law where one having a liability or a right or a fiduciary relation * * * pays a debt owing by another under such circumstances that he is, in equity, entitled to the security or the obligation held by the creditor whom he has paid. See Restatement of the Law of Restitution, Section 162.
>
> "One is not a volunteer, so as to be denied subrogation, who advances money to another for the payment of claims, with an express or implied agreement of either the debtor or creditor, that he shall acquire, or be subrogated to, the rights which the person paid had under a * * * contract * * *.
>
> * * * * * *
>
> "Whether the payment of the debt of another is for the purpose of protecting an interest of the one who pays the debt; whether it is paid because of a moral obligation; whether it is a payment by a volunteer—*all of these considerations are irrelevant in a case of conventional subrogation.*" (Emphasis added.)

This phase of Commercial Standard was followed in Southwestern Indemnity Co. v. National Sur. Corp., 277 F.2d 545, 549 (5th Cir., 1960), and in Liberty Mutual Ins. Co. v. Standard Acc. Ins. Co., 164 F. Supp. 261 (S.D.N.Y.1958). In the present case each of the policies issued by the consignors' insurers contains such a subrogation clause.

As noted above, Slifkin's personal liability to the consignors must be grounded on his contractual enlargement of his common-law liability. And if the consignors' insurers have any right to subrogation, it must be to this right of their insureds. This question of subrogation of an insurer to the collateral or contract rights of the insured has caused considerable difficulty and difference of opinion both in the decisions and in pertinent commentaries. See generally Note, "Right of Insurer to Subrogate to Collateral Rights of the Insured," 20 Md.L. Rev. 161 (1960); Note, "Subrogation of the Insurer to Collateral Rights of the Insured," 28 Colum.L.Rev. 202 (1928); King, "Subrogation Under Contracts Insuring Property," 30 Tex.L.Rev. 62, 71 (1951); In re Future Manufacturing Coop., 165 F.Supp. 111 (N.D.Cal.1958).

■ The cases as a whole have varied their results according to the nature of the relationship between the insured and the third party. Thus decisions in the same jurisdiction seem to have permitted subrogation in the mortgagor-mortgagee and probably in the lessor-lessee situations, but have denied it in the vendor-vendee relationship. The difficulty inherent in the concept of subrogation to contract rights lies in the fact that the problem is basically one of allocation of the burden of loss as between an insurer and an innocent third party. And in the case of "equitable" or "legal" subrogation the equities in favor of the insurer are simply not so decisive as they are when the third party is a tort-feasor. But in the case of "conventional" subrogation, as here, the relative equities are of no concern. Consequently, it is the court's opinion that the rule of the Commercial Standard and Southwestern Indemnity cases, supra, should apply

here, although no case on this particular point has been found.

With respect to "equitable" subrogation, furthermore, King, supra, reasons in 30 Tex.L.Rev. at 83–84:

"A bailee who would ordinarily be held liable only for damage to the bailed property caused by his negligence may, however, enlarge his legal responsibility therefor by contract, express or implied, even to the extent of making himself absolutely liable without fault. * * * While the writer has not seen any cases permitting the insurer to be fully subrogated to the bailor's claim where this type of absolute liability exists, all indications are that the insurer does have this right under the present state of the law."

It is evident that the decided cases concerning the vendor-vendee, mortgagor-mortgagee, owner-building contractor, etc. situations involve extraneous factors which render those decisions impertinent here. See, e. g., Brownell v. Board of Education, 239 N.Y. 369, 146 N.E. 630 (1925), 37 A.L.R. 1319; Raplee v. Piper, 3 N.Y.2d 179, 164 N.Y.S.2d 732, 143 N.E.2d 919, 64 A.L.R.2d 1397 (1957); Vogel v. Northern Assur. Co., 219 F.2d 409 (3d Cir., 1955); Flint Frozen Foods, Inc. v. Firemen's Ins. Co. of Newark, 8 N.J. 606, 86 A.2d 673 (1952); Foley v. Manufacturers' & Builders' Fire Ins. Co., 152 N.Y. 131, 46 N.E. 318, 43 L.R. 664 (1897); In re Future Manufacturing Coop., supra. Typically, in the vendor-vendee cases, for example, a significant if not controlling factor is the division of interests in the property under an executory contract of sale; the vendee, as equitable owner, is given the benefit of the vendor's insurance, at least where the risk of loss is upon the vendee.

■ More analogous to the present case is Chicago, S. L. & N. O. R. R. v. Pullman Car Co., 139 U.S. 79, 11 S.Ct. 490, 491, 35 L.Ed. 97 (1891), in which Pullman leased railroad cars to Chicago under a contract providing that the lessee was to bear responsibility for damage to the cars "occasioned by accident or casualty." A loss to cars by fire originating "from a cause unknown" was held to be within the terms "accident or casualty," making Chicago liable to Pullman irrespective of proof of the former's negligence. Pullman's insurer had fully indemnified Pullman for the loss. Appropriate here are the remarks of the Court in 139 U.S. at 87–88, 11 S.Ct. at 493:

"Upon payment of the loss, or to the extent of any payment by them on account of such loss, the insurance companies were subrogated to the rights of the insured, and could, in the name of the insured * * * maintain an action against the railroad company for indemnity * *. The acceptance of a given amount from the insurance companies in full discharge of their liability did not affect the right of the plaintiff to recover from the railroad company the whole amount of the loss *for which the latter was responsible under its contract.* * * * The principle is thus stated by Lord Blackburn in Burnand v. Rodocanachi, L.R. 7 App. Cas. 333, 339: 'The general rule of law * * * is that, where there is a contract of indemnity * * * and a loss happens, *anything which reduces or diminishes that loss* reduces or diminishes the amount which the indemnifier is bound to pay * * *.' Castellain v. Preston, 11 Q.B.Div. 380." (Emphasis added.)

Compare Pennsylvania Lumbermens Mutual Fire Ins. Co. v. Nicholas, 253 F.2d 504 (5th Cir., 1958), which quotes the above passage from the Pullman case. And while the English rule freely permitting subrogation to contract rights has not been followed widely in the United States (particularly in the vendor-vendee situation), there is in Brownell v. Board of Education, supra, a strong dictum that the English decisions might be followed in New York in some instances. Furthermore, in Allemania Fire Ins. Co. v. Keller Diamond Corp., supra, New

York lower courts held in effect, without mention of the above-discussed considerations, that a bailor's insurer could recover from the bailee on the rights of its insured under the terms of a consignment memorandum. The court thus concludes that in the present case the consignors' insurers are entitled to subrogation to the rights of their insureds against Slifkin.

### Effect of Loan Agreements on Real Party in Interest Question

Relative to Fed.R.Civ.P. 17, 28 U.S. C.A., it is observed in 3 Moore, Federal Practice Par. 17.07, at 1330 (2d ed. 1948):

> "Cases construing the real party in interest provision can be more easily understood if it is borne in mind that the true meaning of real party in interest may be summarized as follows: *An action shall be prosecuted in the name of the party who, by the substantive law, has the right sought to be enforced * * *.*

> "Except where a federal right is involved, the substantive law to be looked to, of course, is the law of the state in which the federal district court is held. State procedural statutes are not to be followed. If by the state substantive law a person has an enforceable right, he is a real party in interest for the purposes of an action in the federal court."

 While some cases in applying this rule apparently have looked only to the internal law of the forum state, it would seem that the better view is that identification of substantive rights should be made with reference to the forum state's conflicts rules, as was done in Rosenfeld v. Continental Bldg. Operating Co., 135 F.Supp. 465 (W.D.Mo.1955). Under the Alabama conflicts rule, as quoted above from J. R. Watkins Co. v. Hill, supra, the legal effect of an obligation is controlled generally by the *lex loci contractus*, which presumably is, in the case of the loan agreements, that of

New York. Slifkin urges, however, that the loan agreements are to be performed in Alabama by the institution of suit here and that therefore the rule's exception—that the law of the place of performance governs a contract's obligation if it "is to be performed in some other place" than that of execution—is applicable. However, it is evident from Hill and other cases—Franklin Life Ins. Co. v. Ward, 237 Ala. 474, 187 So. 462 (1939); Southern Express Co. v. Gibbs, 155 Ala. 303, 46 So. 465, 18 L.R.A.,N.S., 874 (1908); Southern Ry. v. Harrison, 119 Ala. 539, 24 So. 552, 43 L.R.A. 385 (1898)—that the place of performance governs validity and legal effect only when it affirmatively *appears* in the contract that performance is to be in some *particular* place other than that of execution. Moreover, as clearly expressed in Southern Ry. v. Harrison, supra, the exception applies only when it is contemplated that performance is to be *wholly* in another place. Since neither is true with respect to the loan agreements in the present case, New York law should be applied.

In 1950 the New York real-party-in-interest statute, N.Y.Civ.Prac.Act, § 210, was amended so as to provide in substance an exception to the real-party requirement in the case of an insured who has executed a loan agreement. Prior to this change, a number of conflicting interpretations of the effect of the loan agreement were rendered by New York intermediate courts including the Appellate Division. Affirmances by the Court of Appeals in memorandum opinions on the whole shed little light on that court's position. It does appear, at any rate, that the view upon which Slifkin most heavily relies—that of Yezek v. Delaware, Lackawanna & Western R. R., 176 Misc. 553, 28 N.Y.S.2d 35 (App.T.1941), holding that advances under a loan agreement constitute "payments" whenever the insurer's liability is not contingent—is not the law. The chief question seems instead to be whether it is required, in order that a loan agreement be held to constitute a "loan", that the insurance policy contain authorization for execu-

tion of a loan receipt as an alternative to outright payment.

The three most recent pre-1950 Court of Appeals decisions involving the issue of loan receipts may be interpreted to answer this question. Hartzberg v. New York Cent. R. R., 181 Misc. 129, 41 N.Y. S.2d 345 (Trial Term 1943), held on the authority of the leading federal case, Luckenbach v. W. J. McCahan Sugar Refining Co., 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170 (1918), that a loan agreement was a valid *loan*. The insurer's liability in Hartzberg was not contingent, and there was no mention in the opinion of authorization in the policy of a loan agreement. The Appellate Division affirmed without opinion in 268 App.Div. 904, 51 N.Y.S.2d 741. In 295 N.Y. 703, 65 N.E.2d 337 (1946), the Court of Appeals, simply stating the issues without discussion, affirmed. However, in the same volume of the New York reports appears Sosnow, Kranz & Simcoe v. Storatti Corp., 295 N.Y. 675, 65 N.E.2d 326 (1946), in which the Court of Appeals affirmed without opinion an Appellate Division decision in 269 App.Div. 122, 54 N.Y.S.2d 780, upholding a loan agreement as a "loan" on the ground that a provision of the policy authorized its execution. The last of the later "expressions" of the Court of Appeals is Charles Miller Coat Co. v. Myram Herbert, Inc., 300 N.Y. 477, 88 N.E.2d 659 (1949). That decision affirmed without opinion a decision of the Appellate Division holding a loan agreement to constitute a "payment" and stating, in 275 App.Div. 821, 89 N.Y.S.2d 703:

> "Determination of the Appellate Term, affirming the order of the City Court, affirmed with costs to the defendant-respondent. No clause authorizing the giving of a loan receipt is contained in the insurance policy."

On the basis of the distinctions suggested in the Sosnow and Miller Coat cases (although apparently disregarding Hartzberg), the District Court for the Western District of Missouri concluded in Rosenfeld v. Continental Bldg. Operating Co., supra, that under the law of New York a loan was a "loan" only when a loan receipt was expressly authorized by a policy provision. Accord: Maurice Slater Trucking Co. v. Maus, 273 App. Div. 139, 77 N.Y.S.2d 343 (relying only on Sosnow case). If an interpretation must be given to the later decisions of the Court of Appeals, that in Rosenfeld seems most justifiable. Under this view only Nathansohn-Lipschutz and Burkley are real parties in interest since only their policies contained such authorization. It is interesting to note, however, that the post-1950 opinions of the United States District Courts sitting in New York apparently have not recognized any such distinctions. See Hartford Fire Ins. Co. v. Commercial Union Assur. Co., 131 F.Supp. 751 (S.D.N.Y.1955); Perrera v. Smolowitz, 11 F.R.D. 377 (E.D. N.Y.1951) (relying solely on authority of the line of federal cases beginning with Luckenbach, supra).

Notwithstanding the above discussion, there is considerable authority upholding the validity of loan agreements apparently without relying on the substantive law of the forum state. Thus, 3 Moore, Federal Practice Par. 17.09, at 1349 (2d ed. 1948), states without qualifications:

> "An insurer which has merely made a 'loan' to an insured, to be repaid out of any recovery from a third party, is not a real party in interest in an action by the insured against a third party."

Peoples Loan & Finance Corp. v. Lawson, 271 F.2d 529 (5th Cir., 1959), was a suit in trover, for the wrongful conversion of automobiles, by their owner who had been paid by his insurer under a loan receipt. Against the defendant's argument that the plaintiff's insurer was the real party in interest, the court per Judge Hutcheson stated in 271 F.2d at 532:

> "Appellant's first contention that payment by the insurance company, notwithstanding the loan receipt, was not a loan but a payment, and the company, as subrogee, should have been made a party to the suit,

may be summarily disposed of. *It is sufficient to say of it that the law is settled to the contrary and to refer in support to* Luckenbach v. W. J. McCahan Sugar Rfg. Co., 248 U.S. 139 * * *, 39 S.Ct. 53, 63 L.Ed. 170 and to 39 Am.Jur., 'Insurance', Sec. 1337, pp. 1002–3, 1959 Supp. p. 222. Cf. also Green v. Johns, 86 Ga.App. 646, 72 S.E.2d 78, and Augusta Broadcasting Co. v. United States, 5 Cir., 170 F.2d 199." (Emphasis added.)

It is evident that despite diversity jurisdiction the law of the forum state (Georgia) was not relied on primarily. Judge Cameron dissented on the ground that Luckenbach was distinguishable. In accord with Lawson are Celanese Corp. of America v. John Clark Industries, 214 F.2d 551 (5th Cir., 1954); Export Leaf Tobacco Co. v. American Ins. Co., 260 F.2d 839, 847 (4th Cir., 1958) (makes no reference to law of forum state); and Automobile Ins. Co. of Hartford v. Springfield Dyeing Co., 109 F.2d 533 (3d Cir., 1940).

### Waiver of Real Party in Interest Objection

 It is observed in 3 Moore, Federal Practice Par. 17.07, at 1330–31 (2d ed. 1948):

"The better view seems to be, too, that an action prosecuted by one other than the real party in interest should not be dismissed by a court on its own motion, but only after seasonable objection by the opposing party, unless the defect would deprive the court of federal jurisdiction."

In accord is 2 Barron & Holtzoff, Federal Practice & Procedure § 382, at 22–23. This statement is supported by several cases. In Clark v. Chase Nat. Bank of New York, 45 F.Supp. 820, 823–824 (S.D.N.Y.1942), the defendants' motion to dismiss a co-plaintiff on the ground that it was not a real party in interest under Fed.R.Civ.P. 17(a) was made before trial, but not until some five years after commencement of the suit and after depositions and discovery. Although the co-plaintiff was found in fact not to be a real party in interest, the defendants' motion was overruled solely on the ground of the defendants' delay in asserting the objection. The court relied on an observation to the same effect by Judge Clark in Rosenblum v. Dingfelder, 111 F.2d 406, 407–408 (2d Cir., 1940) (dictum). E. Brooke Matlack, Inc. v. Walrath, 24 F.R.D. 263 (D.Md.1959), was an action by an insured, whose insurer had reimbursed it for the loss sustained, against a third party for indemnity. On oral motion by the plaintiff to amend its pleadings to enter the case in the name of plaintiff to its own use and to the use of its insurers the real-party-in-interest issue somehow was raised. Noting that the defendant had failed to raise the issue in his pleadings or at the pretrial conference, the court stated in 24 F.R.D. at 266 (dictum):

"'An objection that the plaintiff is not the real party in interest must be made with reasonable promptness and may be waived by delay' * *. [Citations omitted.] Clearly defendant has not complied with Rule 9(a), F.R.Civ.P., 28 U.S.C.A. dealing with pleading special matters and requiring inter alia that when 'a party desires to raise an issue as to * * * the capacity of any party to sue, * * * he shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge.'"

However, rather than dispose of the matter on the ground of the defendant's waiver of objection, the court decided to grant the motion to amend and to have the defendant's insurer impleaded as third party defendant since, "Both sides in this case have taken the position that this action is in reality a fight between insurance companies."

 In the present case, Slifkin's answers to the cross-claims contain only general denials, and the issue of real parties in interest is not contained in

the pretrial order. Moreover, while in the above-mentioned cases the issue was raised before trial, here the question was raised by the court *sua sponte* after all parties had rested. Under the circumstances it obviously would have been prejudicial to cross-claimants to have had their claims dismissed at that stage of the proceedings on the ground they were not real parties. On the other hand, as evidenced by the acceptance by most courts of the loan agreement as a valid loan for real-party purposes, the trial of the cross-claims in the name of the consignors cannot be considered to have been prejudicial to Slifkin. On the balancing of the equities, therefore, the court, in the exercise of discretion is inclined to disregard any possible real-party-in-interest objections.

In summary, the court prefers to dispose of the real-party-in-interest question, to knock down the straw man thus raised, on the basis that Slifkin waived any objection, if tenable at all, by failing to complain that cross-claimants were not real parties in interest until after the trial had been concluded.

### Effect of "In-Trust-or-on-Commission" Clauses

█ Both of Slifkin's policies contain clauses which state in part:

> "The money, securities and other insured property (except the Premises) may be owned by the Insured or held by him in any capacity whether or not the Insured is liable for the loss thereof."

Generally, such a clause is held to insure the bailor's insurable interest under a third party beneficiary theory, it being necessary only that there be an expression in the bailee's policy of an intent to insure the bailor's interest. Patterson, Essentials of Insurance Law, §§ 27–28 (2d ed. 1957). Cf. Hagan v. Scottish Union & Nat. Ins. Co., 186 U.S. 423, 22 S.Ct. 862, 46 L.Ed. 1229 (1902). The express language of this clause gives to the bailor a right to be indemnified under the bailee's policy irrespective of the bailee's legal liability for the loss. Cf.

Globe & Rutgers Fire Ins. Co. v. United States, 202 F.2d 696 (5th Cir., 1953). As clearly indicated in Snow v. Carr, 61 Ala. 363 (1878), subsequently followed in Goldstein v. Harris, 24 Ala.App. 3, 130 So. 313 (1930), cert. denied, 221 Ala. 612, 130 So. 315, the Alabama cases are fully in accord with these general principles.

█ While it has been held, as in Texas City Terminal Ry. v. American Equitable Assur. Co., 130 F.Supp. 843 (S.D.Tex.1955), that the bailor, as a third party beneficiary, may elect to reject the benefits of a bailee's "in-trust" clause, neither authority nor reason support Slifkin's contention that the bailee can avoid the effect of the clause simply by failing to file proofs of loss for the bailor's property in his possession. In Snow v. Carr, supra, a fire policy taken out by defendant piano dealer contained an "in-trust" provision. The loss had exceeded the policy's face value, and the defendant had been indemnified to the full amount of the policy. In a suit against the dealer by the owner of a piano destroyed while in the dealer's possession, the court held that the owner was entitled to indemnification under the "in-trust" clause even though the bailee did not include the plaintiff's piano in the proofs of loss and even though the bailor was unaware of the dealer's insurance until after the loss. Elsewhere, moreover, it has been held that the bailor may maintain independently an action against the bailee's insurer in such a case, even where the bailee has deliberately omitted the bailor's claim from proofs of loss. B. N. Exton & Co. v. Home Fire & Marine Ins. Co., 249 N.Y. 258, 164 N.E. 43 (1928). See Stillwell Frozen Foods, Inc. v. North British & Mercantile Ins. Co., 184 F.Supp. 629 (W.D.Ark.1960); Globe & Rutgers Fire Ins. Co. v. United States, supra. In Alabama the general principle has been applied in other contexts: a third party beneficiary's right to bring an action directly against the obligor for enforcement of his rights under a contract to which he was not a party has been upheld repeatedly. E. g., Mutual

Benefit Health & Accident Assn. of Omaha v. Bullard, 270 Ala. 558, 120 So.2d 714 (1960); Franklin Fire Ins. Co. v. Howard, 230 Ala. 666, 162 So. 683 (1935).

When the face amount of the bailee's policy is insufficient to indemnify the combined loss sustained by both bailor and bailee, the problem arises as to the proper distribution of the available proceeds. This question is discussed in 5 Couch, Insurance 2d § 29:57, at 339 (1960):

"The cases reflect some apparent difference of opinion as to the right of the bailee to deduct the amount of his own claim before accounting to the bailor, if the proceeds of the insurance are not sufficient to cover the entire loss. There is, however, a distinction to be observed in this connection between the right of the bailee to deduct the loss on his own property covered by the insurance, and his right to deduct the amount of his charges or liens against the property of the bailor covered by the insurance. When this distinction is observed the weight of authority seems to deny the bailee's right to deduct the loss on his own property, but to affirm his right to deduct the amount of his lien or charges upon the bailor's property covered by the policy."

Cited as a leading case in support of the above statement is Snow v. Carr, supra. But that case does not hold, as urged by cross-claimants, that the bailee is entitled only to the residue remaining after the bailor is fully compensated for his own losses. The opinion seems to conclude rather that both the bailor and the bailee may recover equally in the amounts which their respective losses bear proportionately to the total proceeds of the policy. Thus, the court states in 61 Ala. at 370–71:

"In regard to a similar policy, it was * * * held [in Siter v. Morrs, 13 Pa. 220] that it afforded to the *property* of the assured and that of his customers, 'equal protection.' 'Its terms (says the opinion) place all the goods in the warehouse from time to time, on the same level; all are equally protected. A similar decision had been made in this State more than twenty-five years before in Watkins v. Durand * * * [1 Port. 251 (Ala.1834)]. It was then held, of a policy like those taken by Mr. Snow [the bailee]: 'That the sum at which the policy was valued may have been less than the value of all the articles consumed, does not destroy the right of any for whose benefit the insurance was effected, to his proportion of the proceeds.' "

The court concluded in 61 Ala. at 372:

"The rule for distributing among several, the proceeds of a security provided for them all in common, but insufficient for the payment of all in full, is—that *equality* is *equity* * * *."

No Alabama case inconsistent with the Snow opinion has been discovered. Patterson, supra, § 29 makes at 130 an observation to the effect that where the bailor has his own insurance on the same property that is covered by the bailee's policy, the bailor should be compelled to resort to his own policy before claiming proration with the bailee. Except where the *bailee's* policy contained an "excess insurance" clause, however, no case expressing such a view was found in any jurisdiction. Therefore, disregarding for the moment the impact of the various "other insurance" clauses, the consignors in the present case appear to be entitled under Alabama law to share proportionately with Slifkin in the proceeds recoverable under Slifkin's policies.

Included in the evidence is a report of the firm of Franklin, Screven and Turner, certified public accountants, which indicates that the cost value of the total inventoried property lost is $37,297.55, consisting of $19,883.87 representing the value of Slifkin's own merchandise and $17,413.68 representing the value of property on consignment. In addition,

the court finds that Slifkin lost in the robbery jewels of the value of $10,000, representing savings, which were not reflected in his inventory of property held for sale. This property was insured by Slifkin's two policies providing total coverage up to $20,000.00. Under the rule formulated in Snow, computation of the portion of the proceeds to which Slifkin is entitled is as follows:

$$\frac{\$29,883.87}{\$47,297.55} = 63.1827\%$$ (percentage Slifkin's loss is of whole loss)

$20,000 x 63.1827% = $12,636.54 (amount of proceeds to which Slifkin is entitled for loss of his own property, which amount is not affected by "other insurance" since there. was no other insurance thereon. Slifkin's insurers do not contend that *vis-a-vis* one another their "other insurance" clauses are operative; each is ready to pay the full value of its policy.)

———◆———

Disregarding the "other insurance" provisions, the consignors are entitled to recover under Slifkin's policies in the following amounts:

Nathansohn-Lipschutz:
$$\frac{\$\ 3,033.80}{\$47,297.55} = 6.4143\% = \$1,282.86$$

Ullmann:
$$\frac{\$\ 3,335.68}{\$47,297.55} = 7.0525\% = \$1,410.50$$

Burkley:
$$\frac{\$\ 6,718.95}{\$47,297.55} = 14.2057\% = \$2,841.14$$

Kornreich:
$$\frac{\$\ 4,325.25}{\$47,297.55} = 9.1448\% = \$1,828.96$$

———◆———

### Effect of "Other Insurance" Clauses

Slifkin's two policies contain identical "other insurance" clauses which provide:

"If the insured or any other interested party carries other insurance covering such loss as is covered by this policy, the company shall not be liable for a greater proportion of any such loss than the amount applicable thereto as hereby insured, bears to the total amount of all valid and collectible insurance covering such loss."

The policies of consignors Nathansohn-Lipschutz and Burkley contain identical "other insurance" clauses which provide:

"It is understood and agreed that any insurance granted herein shall not cover (excepting as to the legal liability of the Assured), when there is any other insurance which would attach if this policy had not been issued, whether such insurance be in

the name of the Assured or of any third party. It is, however, understood and agreed, that if under the terms of such other insurance (in the absence of this policy) the liability would be for a less amount than would have been recoverable under this policy (in the absence of such other policy) then this policy attaches on the difference."

The "other insurance" clause of Kornreich's policy provides:

"If the assured or any other party carries other insurance covering such loss or damage as is covered by this Policy, the Underwriters shall not be liable for a greater proportion of any such loss or damage than the amount applicable thereto as hereby insured bears to the total amount of all valid and collectible insurance covering such loss or damage."

Ullmann had two applicable policies with Lloyd's, both of which insured Ullmann against loss of his goods *on memorandum*. The first policy insured to a limit of $3,000.00 and contained no "other insurance" clause. The second insured to the limit of $15,000.00 but only in excess *of insurance recoverable under the first* policy; it contains an "other insurance" clause which provides:

"In the event of *the named Insured* having other insurance covering such loss and/or damage as is covered by this policy, Underwriters shall not be liable for a greater portion of any loss and/or damage than the amount hereby insured bears in percentage to the total amount of all insurance valid and collectible covering such loss." (Emphasis added.)

■ It should be noted, first, that each of the "other insurance" clauses here involved, with the exception of Ullmann's policy, defines "other insurance" in substance as that procured by and in the name of *any* interested person. Except as to Ullmann's policies, therefore, the "other insurance" clauses are operative although the other insurance was in the name of one other than the named insured. The importance of the terminology of the definition of "other insurance" is indicated in Automobile Ins. Co. of Hartford v. Springfield Dyeing Co., 109 F.2d 533 (3d Cir., 1940), and Export Leaf Tobacco Co. v. American Ins. Co., 260 F.2d 839, 846 (4th Cir., 1958). Cf. Jewelers Mutual Ins. Co. v. Balogh of Coral Gables, 272 F.2d 889, 894 (5th Cir., 1959).

■ Cross-claimants strongly urge as controlling in this case the distinctions between so-called "blanket" and "specific" insurance. Slifkin's policies, they contend, are specific and therefore provide primary coverage, thereby making the consignors' policies excess insurance irrespective of "other insurance" clauses. In the setting of this case such an insistence is misconceived. As respects those policies of consignors containing "excess insurance" clauses (Nathansohn-Lipschutz and Burkley), there is of course no need for such an argument since the clauses themselves provide that they are "excess." As to the consignor's policy containing a "pro rata" clause (Kornreich), Commercial Standard Ins. Co. v. American Employers Ins. Co., 209 F.2d 60 (6th Cir., 1954), affords an apt answer. That case involved a contest between two liability insurers which had insured the same person—one for liability arising from ownership and operation of insured's automobile, the other for liability arising through the operation of insured's service station. The insured's liability arose when a metal ring flew off a tire which was being changed and struck a bystander. The automobile liability insurer urged that the premises liability insurer provided primary coverage and that its liability was secondary. In 209 F.2d at 63, Judge McAllister said:

"All of the above policies covered the loss in this case, although they were phrased in different language and approached the subject of the liability from a different aspect. If Commercial's [the automobile liability insurer] policy had not been in existence, American Employers would have been liable for the entire

loss; and if the latter's policies had not been in existence, Commercial Standard would have been so liable. *In such a case, misty indeed are the contours that may be perceived between primary and secondary liability. In any event, here, one circumstance obviates the necessity of considering such questions* and determines the issue: all of the policies of both companies * * * [contained pro rata 'other insurance' clauses]. *Where the loss of an insured is covered by several policies in different insurance companies, it is unimportant whether the coverage is specific in one policy and general in another, if the policies contain pro rata clauses* providing that the liability under each policy shall be only that proportion of the total loss which the policy bears to the total amount of the policy. In such a case, unless there are other provisions in the policies otherwise specifically limiting or conditioning liability thereunder, the insurance companies are bound by what they have expressly covenanted in their policies as to their liability. In these circumstances, the insurance of none is primary or secondary; the liability is concurrent, and should be pro rated among them." (Emphasis added.)

Nor do the cases cited in cross-claimants' brief, in Annot., 150 A.L.R. 636 (1944), or in 6 Appleman, Insurance Law & Practice § 3912 (1942), and 7 Couch, Insurance § 1850 (1930) support cross-claimants' contention. Fairchild v. Liverpool & London Fire & Life Ins. Co., 6 Sickels (51 N.Y.) 65 (1872), is quite distinguishable. There the bailor-owner's policy contained, according to the opinion (the exact words of the policy not being given), express language to the effect that the policy would not cover, except as excess insurance, goods upon which there was *any more specific* insurance. Similar indications of an express intent or agreement between parties that the bailor's insurance was to be "excess" or "blanket" insurance with respect to

the particular bailee exist in the other cases on which cross-claimants rely—Federal Intermediate Credit Bank of Baltimore v. Globe & Rutgers Fire Ins. Co., 7 F.Supp. 56 (D.Md.1934); Texas City Terminal Ry. Co. v. Equitable Assur. Co., 130 F.Supp. 843 (S.D.Tex.1955); and Davis Yarn Co. v. Brooklyn Yarn Dye Co., 293 N.Y. 236, 56 N.E.2d 564 (1944). There is nothing to indicate that Kornreich's policy was intended to provide only "blanket" or secondary coverage. In fact, under the definitions of "blanket" or "floater" policies offered by cross-claimants it could as readily be concluded that it is Slifkin's policies which are "blanket." In respect to Ullmann's policies, which insured specifically property on memorandum, the above discussion is even more appropriate. No Alabama case pertinent to the question here of "blanket" and "specific" liabilities was found.

In considering the "other insurance" clauses, the policies insuring the property of Nathansohn-Lipschutz and Burkley will be discussed first. In order to ascertain the amounts due to these consignors under the "in-trust" provisions of Slifkin's policies, the effect of their "other insurance" clauses must be weighed against that of such clauses in Slifkin's policies. Clauses in the policies of both of these consignors provide that they shall be "excess insurance" and that they shall not inure to the benefit of bailees; both of Slifkin's policies contain "pro rata" clauses.

 Balogh of Coral Gables v. Jewelers Mutual Ins. Co., 167 F.Supp. 763 (S.D.Fla.1958), involved suits by a consignor and consignee against their own respective insurers to recover losses occasioned by a theft from the consignee's shop of both consigned and the consignee's own jewelry. The policies of both the consignor and consignee contained "other insurance" clauses substantially identical to those of Nathansohn-Lipschutz and Burkley. The consignee's insurer contended that its liability to the consignee was limited by the "other insurance" clause in its policy. The court held, however, that by virtue of the pro-

vision in the *consignor's* policy that it "shall in no wise inure directly or indirectly to the benefit of any * * * bailee," there was under the terms of the *consignee's* "other insurance" clause no other insurance which "attaches." Consequently, the court concluded, the "other insurance" clause of the consignee's policy was inoperative. On appeal the Fifth Circuit affirmed on another ground: a provision in the consignee's "other insurance" clause excepting its applicability when, as there, the insurer's liability was predicated on the legal liability of the insured. Jewelers Mutual Ins. Co. v. Balogh of Coral Gables, 272 F.2d 889, 894 (5th Cir., 1959). Additionally, there is in the present case a stronger reason for the non-operation of Slifkin's "other insurance" clauses in respect to the property of Nathansohn-Lipschutz and Burkley. While in Balogh two "excess insurance" clauses were involved, here we have a "pro rata" clause against an "excess insurance." While there appear to be no cases resolving conflicting "pro rata" and "excess insurance" clauses in property insurance policies, in the automobile liability insurance field the law in this regard is quite well developed. See Annot., "Apportionment of liability between automobile liability insurers where one of the policies has an 'excess insurance' clause and the other a 'proportionate' or 'prorata' clause," 76 A.L.R.2d 502 (1961). Cf. Annot., 46 A.L.R.2d 1163 (1956). No Alabama decision on this point was found. Disregarding the factual variations present in these cases, the overwhelming majority of the decisions from other jurisdictions have given full effect to the "excess insurance" clauses, making the insurer with the "pro rata" clause primarily liable to the full extent of its policy. E. g., United Services Auto Assn. v. Russom, 241 F.2d 296 (5th Cir., 1957); General Ins. Co. of America v. Western Fire & Cas. Co., 241 F.2d 289 (5th Cir., 1957); McFarland v. Chicago Express, Inc., 200 F.2d 5 (7th Cir., 1952). Although the automobile liability insurances involve the additional fact that the "excess" clause is usually tied to the "non-ownership" coverage while the "pro rata" clause is related to ownership coverage, this factor does not seem to have been considered at all determinative in the decided cases and would not seem to qualify the applicability of the theory of these cases to property insurance situations of the kind in the instant case. For, as stated in Russom at 302 of 241 F.2d, the issue is conceived to be only whether to "give effect to the plain meaning of the words 'shall be excess over' ". In the McFarland case, in fact, full effect was given to the "excess" clause even though it there related to ownership coverage and the "pro rata" to drive-other-car coverage. The theory of these cases is simply that by virtue of the "excess insurance" clause there is no other "valid and collectible" insurance within the meaning of that phrase as used in the "pro rata" clause. General Ins. Co. v. Western Fire & Cas. Co., supra, at 295 of 241 F.2d. Although the Fifth Circuit in Balogh found it unnecessary in 272 F.2d at 894 to extend these automobile liability decisions to the property field, there appears to be no reason why the theory on which they were decided is not precisely applicable to the present case.

■ The question of the effect of the "other insurance" clauses in Slifkin's policies in respect to the consigned property of Kornreich and Ullmann is easily disposed of. Since the policies of Kornreich (containing a "pro rata" clause) and of Ullmann (containing in respect to Slifkin no "other insurance" provision) constitute other "valid and collectible insurance covering such loss" within the meaning of that phrase as used in Slifkin's policies, Slifkin's "other insurance" clauses are operative. Accordingly, Slifkin's insurers are liable only proportionately for losses to the property of Kornreich and Ullmann.

■ There arises, however, the problem of computation of the proportionate liability of Slifkin's insurers. Its solution is controlled by the express terms of the policies. The pertinent part of the "other insurance" clauses in each of Slif-

kin's policies, to which that in Kornreich's policy is identical, states:

> "[T]he Company shall not be liable for a greater proportion of any such loss *than the amount applicable thereto as hereby insured,* bears to the total amount of all valid and collectible insurance covering such loss. (Emphasis added.)

By the calculations made above under the rule of Snow v. Carr, supra, the "amount applicable" to Kornreich's loss "as hereby insured" is $1,828.96, and to Ullmann's loss is $1,410.50. The phrase, "total amount of all valid and collectible insurance covering such loss," is held to refer to the policy limits of applicable insurance. See 8 Appleman § 4913, at 328. In respect to Kornreich's loss, the amount of all insurance is $125,000.00 under its own Lloyd's policy plus $1,828.-96 (the maximum portion of the limits of Slifkin's policies applicable to Kornreich's property), totalling $126,828.96. In respect to Ullmann's loss, both of Ullmann's own policies are valid and collectible insurance since Ullmann's loss exceeded $3,000.00 (the limit of his Lloyd's Travellers' Policy) and his Lloyd's Excess Outside Holdup Policy was "excess" only in respect to the Travellers' Policy. Consequently Ullmann's loss is covered by $18,000.00 under his own policies ($3,-000 under Lloyd's Travellers' and $15,000 under Clause 1(g) of Lloyd's Excess Outside Holdup) and $1,410.50 under Slifkin's policies, making a total of $19,410.-50. The liability of Slifkin's insurers for Kornreich's loss is thus as follows (the proportion the amount insured under Slifkin's policy bears to the total insurance):

$$\frac{\$\ 1,828.96}{\$126,828.96} = 1.4421\%$$

$$\$\ 4,325.25 \text{ (Kornreich's loss)} \times 1.4421\% = \underline{\$62.37}$$

---

The liability of Slifkin's insurers for Ullmann's loss is as follows:

$$\frac{\$\ 1,410.50}{\$19,410.50} = 7.2667\%$$

$$\$3,335.68 \times 7.2667\% = \underline{\$242.39}$$

Finally, the problem is presented as to how distribution should be made of the surplus of Slifkin's proceeds allocable to Kornreich and Ullmann under the rule of Snow v. Carr, supra, over the amounts ultimately allocable under the "other insurance" clauses. The surpluses are as follows:

$1,828.96 (amount originally allocable to Kornreich)

−62.37

$1,766.59

$1,410.50 (amount originally allocable to Ullmann)

−242.39

$1,168.11

$1,766.59

+1,168.11

$2,934.70 (total amount of surplus)

The question is whether this sum, too, must be distributed proportionately among the various insureds under Slifkin's "in-trust" clause. This necessitates, of course, a further interpretation of the Snow opinion and the meaning there of the word "proceeds." While no authority has been found, it would seem that the language of Snow would require a further pro rata distribution of this surplus sum among the consignors and Slifkin in the amounts which their respective losses bear to the total loss.

Calculation under the Snow rule for distribution of the surplus, $2,934.70, is as follows:

Slifkin:

$2,934.70 x 63.1827% = $1,854.22

Nathansohn-Lipschutz:

$2,934.70 x 6.4143% = $ 188.24

Ullmann:

$2,934.70 x 7.0525% = $ 206.97

Burkley:

$2,934.70 x 14.2057% = $ 416.90

Kornreich:

$2,934.70 x 9.1448% = $ 268.37

The shares of Kornreich and Ullmann are reduced by the pro rata "other insurance" clause as follows:

Kornreich:

$$\frac{\$\ 268.37}{\$125,268.37} = 0.2142\%$$

$4,325.25 (Kornreich's loss) x 0.2142% = $ 9.26

Ullmann:

$$\frac{\$\ 206.97}{\$18,206.97} = 1.1368\%$$

$3,335.68 (Ullmann's loss) x 1.1368% = $37.92

———◆———

This in turn creates the following surplus:

$268.37 (originally allocable to Kornreich)
— 9.26 (allocable under pro rata clause)
$259.11

$206.97 (originally allocable to Ullmann)
— 37.92 (allocable under pro rata clause)
$169.05

$259.11
+169.05
$428.16 (surplus)

Following the above procedures, this surplus is distributable as follows:

| | |
|---|---|
| Slifkin: | $270.52 |
| Nathansohn-Lipschutz: | $ 27.46 |
| Ullmann: | $ 30.20 |
| Burkley: | $ 60.82 |
| Kornreich: | $ 39.16 |

The pro rata clause reduces Kornreich's and Ullmann's shares to $1.35 and $5.59, respectively, leaving a surplus of $62.42, which is distributable in the following shares:

| | |
|---|---|
| Slifkin: | $39.44 |
| Nathansohn-Lipschutz: | $ 4.00 |
| Ullmann: | $ 4.40 |
| Burkley: | $ 8.87 |
| Kornreich: | $ 5.71 |

Of their shares, Kornreich and Ullmann are due $0.20 and $0.81, respectively, the surplus this time being $9.10, which is allocable as follows:

| | |
|---|---|
| Slifkin: | $5.75 |
| Nathansohn-Lipschutz: | $0.59 |
| Ullmann: | $0.64 |
| Burkley: | $1.29 |
| Kornreich: | $0.83 |

Kornreich's and Ullmann's shares are $0.03 and $0.12, respectively, with a $1.32 surplus, to be divided as follows:

| | |
|---|---|
| Slifkin: | $0.83 |
| Nathansohn-Lipschutz: | $0.09 |
| Ullmann: | $0.09 |
| Burkley: | $0.19 |
| Kornreich: | $0.12 |

After operation of the pro rata clause, Kornreich's and Ullmann's shares are $0.00 and $0.02, respectively, leaving a surplus of $0.19. Inasmuch as a further division would give Kornreich and Ullmann nothing, the $0.19 will be distributed as equally as possible among the other claimants: $0.07 to Slifkin and $0.06 each to Nathansohn-Lipschutz and Burkley.

In summary, adding the sums arrived at above, the proceeds of Slifkin's policies are distributed as follows:

| | |
|---|---|
| To Slifkin: | $14,807.37 |
| To Nathansohn-Lipschutz: | $1,503.30 |
| To Burkley: | $ 3,329.27 |
| To Kornreich: | $ 73.21 |
| To Ullmann: | $ 286.85 |

**582**

The remainders of the consignors' losses, for which Slifkin is liable personally, are:

| | |
|---|---|
| Nathansohn-Lipschutz: | $1,530.50 |
| Burkley: | $3,389.68 |
| Kornreich: | $4,252.04 |
| Ullmann: | $3,048.83 |

Judgment will be entered accordingly.*

* Credit is due William G. Somerville, Jr., Law Clerk to the Court, for the preparation of this opinion.